**HOUSING OPPORTUNITIES MADE EQUAL, INC., Plaintiff–Appellant,**

v.

**The CINCINNATI ENQUIRER, INC., A DIVISION OF GANNETT CO., INC., Defendant–Appellee.**

No. 90–3176.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 6, 1990.

Decided Sept. 5, 1991.

Robert B. Newman (argued and briefed), Kircher & Phalen, Cincinnati, Ohio, for Housing Opportunities Made Equal, Inc., plaintiff-appellant.

John C. Greiner, Glenn V. Whitaker (argued and briefed), Graydon, Head & Ritchey, Cincinnati, Ohio, for Cincinnati Enquirer, a Div. of Gannett Co., Inc., defendant-appellee.

Bradford M. Berry (argued), Miller, Cassidy, Larroca and Lewin, Washington, D.C., William H. Jeffress, Jr. (briefed), Miller, Cassidy, Larroca & Lewin, Washington, D.C., for National Fair Housing Alliance and National Neighbors, amicus curiae.

Steven T. Catlett (briefed), Jones, Day, Reavis & Pogue, Columbus, Ohio, for Dispatch Printing Co. amicus curiae.

Floyd Abrams (briefed), Cahill, Gordon and Reindel, New York City, for American Newspaper Publishers Assn, amicus curiae.

Before KEITH, KENNEDY, and SUHRHEINRICH, Circuit Judges.

KENNEDY, Circuit Judge.

Plaintiff-appellant, Housing Opportunities Made Equal, Inc. ("HOME"), brought this action against the Cincinnati Enquirer ("defendant") alleging its real estate advertising violated the Fair Housing Act, 42 U.S.C. § 3604(a) and (c) ("FHA"), the Civil Rights Act, 42 U.S.C. § 1982, and the thirteenth amendment to the United States Constitution. The District Court granted defendant's motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6). 731 F.Supp. 801. HOME now appeals that part of the District Court's order dismissing its claim under 42 U.S.C. § 3604(c). HOME asks this Court to decide two issues: (1) whether a single advertisement which features only white models raises a factual question of discrimination under the FHA; and (2) whether the publication of multiple advertisements by unrelated realtors which features only white models, when taken in the aggregate, sends a discriminatory message to the ordinary reader in violation of the FHA. For the following reasons, we AFFIRM the judgment of the District Court.

I.

Plaintiff alleges that over a twenty-year period defendant accepted for publication real estate advertisements which, in almost every instance, pictured only white human models. Less than one percent of the advertisements depicting human models pictured a black model. This percentage contrasts with a population comprised of 34% black persons in the City of Cincinnati, 19% in Hamilton County and 12% in the metropolitan statistical area. HOME does not identify any particular advertisement which allegedly violates section 3604(c). Nor does HOME make any allegations with respect to any particular advertiser who placed advertisements with defendant.

II.

HOME wages a two-pronged attack. First, HOME contends that defendant's publication of any advertisement with all-white models violates the FHA or at least raises a factual issue of whether such advertisement is discriminatory.[1] Second,

---

1. It should be noted that HOME did not brief the issues related to a possible discriminatory message arising from the use of white models in a single advertisement. Its entire brief is devot-

HOME alleges that a layout of advertisements which depict models virtually all of whom are white even though independently submitted by various real estate organizations or their agents, when taken in the aggregate, sends a discriminatory message in violation of section 3604(c).

A reviewing court shall grant a motion to dismiss for failure to state a claim when it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). An appellate court reviews *de novo* a trial court's decision regarding a Rule 12(b)(6) motion. *Intake Water Co. v. Yellowstone River Compact Comm'n*, 769 F.2d 568, 569 (9th Cir. 1985), *cert. denied*, 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986). Thus, we must determine whether HOME has failed to allege any set of facts to substantiate the alleged violations of the FHA.

█ We first consider whether HOME has standing to bring this claim. In conducting this analysis, we need not consider "prudential standing"; Congress intended that standing under the FHA extend to the full limits of Article III. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Spann v. Colonial Village, Inc.*, 899 F.2d 24 (D.C.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990). Thus, HOME can establish standing by alleging a concrete and demonstrable injury, including an injury arising from a "purportedly illegal action [that] increases the resources the group must devote to programs independent of its suit challenging the action." *Spann*, 899 F.2d at 27.

One of HOME's primary purposes is the elimination of unlawful racially discriminatory housing practices to all persons seeking housing in the Cincinnati metropolitan area. HOME alleges that defendant's discriminatory advertising has deterred potential renters from seeking housing at the advertised complexes. This, in turn, has caused HOME to devote resources to inves-

ed to a discriminatory message from an aggre-

tigate and negate the impact of these advertisements. Allegation of this injury is sufficient to confer standing upon HOME. *Id.*

## A. Individual Photographs Depicting All–White Models

█ Courts have given a broad reading to the FHA in order to fulfill its remedial purpose. *See Trafficante v. Metropolitan Life Ins., Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). To this end, courts have recognized that section 3604(c) applies to all publishing mediums, including newspapers, *United States v. Hunter*, 459 F.2d 205 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), and have allowed parties to establish a violation of section 3604(c) by proving either an actual intent by a defendant to discriminate or by proving that "[t]o the ordinary reader the natural interpretation of the advertisements published in [the newspaper] ... is that they indicate a racial preference...." *Id.* at 215. HOME seeks to establish liability based on the "ordinary reader" standard.

Section 3604(c) makes unlawful certain practices associated with the sale or rental of housing:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c). In 1980, the Department of Housing and Urban Development, ("HUD"), the agency charged with implementing the FHA, promulgated a regulation to "provide guidance" to newspapers and others concerning nondiscrimination in advertising in connection with real estate. 24 C.F.R. Part 109. Although applying both to the advertising media and to persons placing advertisements, *id.* § 109.-16(a)(1) and (2), these regulations do not

gate of advertisers.

mandate particular actions by these parties. Rather, HUD sought to balance between the "identification of practices which might be viewed as violations of Title VIII and ... the limitation which the First Amendment may impose on mandatory restrictions relating to the publication of advertising.... [T]he regulation describes examples of advertising practices ... which might be indicative of a violation of (or compliance with) Title VIII." 45 Fed. Reg. 57,102 (Aug. 26, 1980). Further, "[w]hile the practices, etc., cited in the regulation are indices of a standard of conduct to evaluate the existence of discrimination in advertising, they are not intended, *per se*, to establish immutable rules, but to serve as examples of practices, usage, content, etc., which *should* be complied with (or avoided), whichever the case may be." *Id.* (emphasis in original). Mandatory language was intentionally avoided.

In keeping with this policy, HUD stated that the selective use of human models in advertisements "may" be discriminatory:

Selective advertising may involve an advertising campaign using human models primarily in media that cater to one racial or national origin segment of the population without a complementary advertising campaign that is directed at other groups.

24 C.F.R. § 109.25(c). In its comments, HUD stated that this section "is intended to preclude selective use of human models in advertising for the purpose of attracting (or discouraging) certain groups covered by Title VIII with respect to certain housing or neighborhoods." 45 Fed.Reg. 57, 105 (Aug. 26, 1980). In another section, HUD stated:

If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing the

majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin, and is not for the exclusive use of one such group.

24 C.F.R. § 109.30(b). In explaining this section, HUD noted:

Civil rights groups commented that models used should reflect, in numbers, the exact percentage of various covered groups in the population, a suggestion which is clearly unworkable. The term "reasonably representing" is intended to assure that models will convey a message of general inclusiveness of persons covered by Title VIII, not literal display of each minority group.

45 Fed.Reg. 57,105 (Aug. 26, 1980).

Several conclusions can be drawn from the language of the FHA and HUD's regulations. On the one hand, the statute and regulations make abundantly clear that an advertisement can discriminate against an individual based on any criteria specified in the FHA. Such discrimination may occur through words or pictures, and the use of all-white models could be a factor in determining whether an advertisement conveys a discriminatory message, although its strength and clarity will depend upon an analysis of the entire advertisement.

On the other hand, the statute and regulations create no fixed and immutable rules to determine whether an advertisement is discriminatory. Certainly the use of particular models may be relevant, but this by itself does not prove that an advertisement is discriminatory or indicates a preference.[2] These regulations and com-

---

**2.** HOME concedes that, with the exception of the use of all-white models, the individual advertisements are otherwise in compliance with the applicable statute and regulations. Thus, all of the advertisements contained on equal housing opportunity logotype, statement or slogan to indicate that the property is available to all *persons,* 24 C.F.R. § 109.30(a); *did not use* words to indicate a preference; and did not describe the property's location in a preferential

manner. Further, defendant published a notice at the beginning of this advertising section to the effect that it will not knowingly accept an illegal advertisement and that all real estate advertised is available on an equal opportunity basis. *Id.* § 109.30(d)(3).

The dissent appears to suggest that we should analyze the use of all-white models in a vacuum, disregarding the other words and symbols used

ments indicate that HUD rejected a mechanical approach which would require the literal display of a member of each protected group. Rather, HUD approached the use of advertising models in a more practical and fluid manner, referring to the concept of an advertising "campaign." At least one other circuit appears to have incorporated the principles underlying HUD's approach into its "ordinary reader" standard. The Second Circuit recently observed:

> [The ordinary] reader does not apply a mechanical test to every use of a model of a particular race. An ad depicting a single model or couple of one race that is run only two or three times would seem, absent some other direct evidence of an intentional racial message, outside Section 3604(c)'s prohibitions as a matter of law.... It thus seems inevitable that close questions of liability will involve

in an advertisement. In light of the other requirements imposed by the regulations, we find such an approach impractical and unnecessarily narrow. An advertisement must be considered in its totality.

3. The dissent appears to suggest that our interpretation of the ordinary reader standard is at odds with at least three other circuits, most notably the Second Circuit's interpretation as stated in *Ragin.* Dissent at 657–59. The passage quoted above, however, makes clear that our interpretation of the ordinary reader standard comports with the Second Circuit's interpretation. We merely take the additional step, apparently commended by the *Ragin* court, of concluding that a single advertisement which features a select number of white models does not, as a matter of law, state a cause of action pursuant to section 3604(c). The other two cases cited by the dissent are equally unsupportive of its allegation. *See Colonial Village,* 899 F.2d at 24; *United States v. Hunter,* 459 F.2d 205 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). The *Spann* court was not confronted with the issue before us, but dealt primarily with issues not related to the substantive claims under the FHA. The dissent cites to the lone comment in the opinion addressing the ordinary reader standard: "that to a 'reasonable reader the natural interpretation of defendants' advertisements ... is that they indicate a racial preference' or an intention to make such a preference." *Spann,* 899 F.2d at 29 (citations omitted). This comment provides little, if any, insight into the issues presented to this court. In *Hunter,* the court applied the ordinary reader standard to an advertisement

advertisers that either use a large number of models and/or advertise repetitively. In such cases, the advertiser's opportunities to include all groups are greater, and the message conveyed by the exclusion of a racial group is stronger.

*Ragin v. The New York Times Co.,* 923 F.2d 995, 1002 (2d Cir.1991).[3]

■ We conclude that a complaint alleging a violation of section 3604(c) based on the single publication of an advertisement which uses a small number of all-white models does not, without more, state a cognizable claim under section 3604(c) as a matter of law. The complaint must allege that an advertiser had the opportunity, based upon either the large number of models used in an advertisement or the numerous advertisements placed by an advertiser with a particular publisher, to include models of a protected group.[4]

using the phrase "white home." With little analysis, the *Hunter* court concluded that such advertisements indicated a preference. Thus, of the three cases cited by the dissent, only one case—*Ragin*—addresses the issue before us in the context of the ordinary reader standard, and that case provides support for our decision today.

4. The dissent mischaracterizes our holding, concluding that we proclaim a *per se* rule that such ads could never cause a reasonable person to feel excluded, unless some other factor were added. Dissent at 658–59. Obviously, our holding recognizes the viability of a claim under section 3604(c) based on an allegation that a particular advertiser pursued an advertising campaign which led to the repetitive publication of advertisements depicting a large number of all-white models.

Further, an advertisement depicting a large group of all-white models could give rise to a section 3604(c) claim. Of course, a publisher also remains liable for publishing advertisements which are discriminatory on their face or with the intent to discriminate. Placed in its proper perspective, our holding is not as limited or rigid as the dissent would suggest; nor does it lead to an absolute rule that such advertisements could never be grounds for a section 3604(c) claim.

In the final analysis, the dissent fails to address the primary reason creating our difference of opinion: the application of our legal conclusions to HOME's complaint. In other words, our dispute essentially concerns whether HOME's complaint states a viable cause of action pursuant to section 3604(c). The dissent

HOME made the following claim in its complaint:

9. At least 34% of the population of the City of Cincinnati is black. 19% of Hamilton County is black. 12% of the Metropolitan Statistical Area is black. During the twenty year period since the Act was passed prohibiting discriminatory advertisements, display advertisements have appeared in the Sunday *Enquirer* featuring hundreds of human models of whom virtually none were black. Nearly all advertisers in the real estate section who have advertisements with human models depict only whites. In group photographs in the real estate section the groups consist of exclusively white people. Of all of the advertisements displaying human models less than 1% include a black person.

17. The real estate display advertisements featured by the *Cincinnati Enquirer* indicate a preference based on race through the use of human models reflecting predominant race of the advertised building, development or community.

18. In light of the *Cincinnati Enquirer's* continuing and longstanding practice of printing and publishing racially discriminatory advertisements, Plaintiffs believe the *Cincinnati Enquirer* has intentionally violated the Fair Housing Act.

The complaint is silent as to the source of the advertisements. At either extreme, we could infer that one advertiser submitted all of the advertisements, or that a different advertiser placed each advertisement.

We need not dwell upon this ambiguity, however. In its brief and at oral argument HOME clarified its position. It stated that its claim rested exclusively upon the use of all-white models and not upon any other factor, such as repetition of advertising by a single advertiser. In its brief, HOME asserted that "[s]uch consistent and overwhelming absence of black models clearly entitles the finder of fact to find a preference ... based on race." At no time did HOME point to a series of advertisements by a particular advertiser or a picture depicting a large number of models all of whom were white in order to establish its section 3604(c) claim. Based on these concessions, we construe HOME's complaint to allege that a single advertisement depicting all-white models is sufficient to state a cause of action under section 3604(c).

Once clarified, HOME's first allegation in its complaint deals only with individual advertisements, and not with a plurality of advertisements. HOME's purpose for pointing to the publication of multiple advertisements is to raise its claim of liability based on its "aggregate message" theory.[5] HOME is not alleging this fact in order to state a claim based on the repetitive advertising by a single advertiser. We hold that such an allegation fails to state a cause of action for purposes of section 3604(c).[6]

merely quotes from HOME's complaint to reach its conclusions and ignores the concessions and clarifications made by HOME in its brief and at oral argument regarding its claims. Once these clarifications are taken into account, it becomes clear that HOME's complaint cannot overcome a Rule 12(b)(6) motion. The dissent's conclusions, while noteworthy, do not apply to the actual claims made in this case based on the record before us.

The relevant portion of the oral argument states:

Plaintiff's Attorney: I would also like to just go back to the pleading in this complaint. We have a thousand ads over a two-year period and in only nine are blacks represented and we allege that that indicates a racial preference.

J. Kennedy: But, it's not any particular ad that indicates—what you're saying is that adding all the ads in together—the effect is to have a racial preference.

Plaintiff's Attorney: That—we are saying that in the complaint, yes.

    \*     \*     \*     \*     \*     \*

J. Kennedy: The problem is in a newspaper there are, let's say, 30 ads all put in by different people and if no one taken alone is discriminatory, you are saying that ... taken as a whole the page is discriminatory. That's basically what you're saying.

Plaintiff's Attorney: The pages over 20 years. Yes.

5. Our holding, therefore, does not address the viability of a claim under section 3604(c) based on an allegation that a particular advertiser repeatedly published advertisements which depict all-white models in a particular publication.

6. The dissent states that a racial preference could be found if "the same or related advertisers or publishers" advertised repeatedly with all-

## B. Liability Based on a Message Created by an Aggregation of Advertisements

■ For purposes of HOME's second claim,[7] it is not necessary that any single advertisement violate the FHA; this claim targets a "message" which cannot be traced to a particular advertisement. In other words, HOME's claim is based on the premise that the whole is greater than the sum of the individual parts: the aggregate message created and sent by the publication of multiple advertisements violates section 3604(c) notwithstanding the legality of each advertisement. In its complaint, HOME sought to hold defendant legally responsible—including the imposition of compensatory and punitive damages—for the creation and effects of this aggregate message. Because we find that the text and purpose of the FHA, as well as the regulations interpreting it, do not support this theory of liability, and because we desire to avoid a constitutional infirmity which would otherwise arise, we decline to construe the FHA to create liability for the possible aggregate message of otherwise nondiscriminatory advertisements.

Section 3604(c) makes clear that a discriminatory message must stem from a "notice, statement, or advertisement" that indicates a racial preference. Hence, liability of a realtor or a publisher stems from the same act: a discriminatory advertisement. Yet HOME does not attack here an advertisement, or a message derived by an ordinary reader from a particular advertisement, but a message separate from and incidental to the individually placed advertisements. Although implicating advertisements in general, this claim does not depend upon a finding that any particular advertisement is discriminatory. We agree with HOME that the FHA must be construed broadly; but the text of the statute—the starting point for construing a statute—ties the prohibition of discriminatory messages to particular advertisements. HOME's cause of action, therefore, does not fall within the literal language of the statute. *See Hunter*, 459 F.2d at 210 (stating that "[l]egislative intent is first to be gathered from the plain meaning of the words of the statute").

The regulations interpreting this section also fail to support HOME's claim. The regulations refer to "advertising campaigns" directed at readers for "certain housing or neighborhoods." Clearly, a random layout of advertisements submitted by independent realtors does not constitute a "campaign"; nor does the aggregate message allegedly communicated by such unrelated advertisements target "certain housing or neighborhoods." In publishing unrelated advertisements, a newspaper is not directing an advertising campaign, and as an advertising medium, a newspaper does not limit advertisements to certain housing or neighborhoods. The regulations contemplate a certain level of specificity in the discriminatory message vis-a-vis the real estate in order to establish a violation of the FHA. A different message may be conveyed by a brochure or related advertisements for a property or development which shows multiple pictures of multiple models, all of them white.[8] We conclude that the interpretation urged by HOME is not supported by, and may run counter to,

---

white models. Dissent at 662. Neither the statute nor the regulations mention such a term, and it is unclear what the dissent means. Nowhere in HOME's complaint is it mentioned that the same advertiser or "related" advertisers repeatedly submitted an advertisement with all-white models.

7. When discussing this claim, we will refer to this theory of liability as the "aggregation theory of liability" and to the message allegedly created and communicated as the "aggregate message."

8. The dissent attacks our distinction between multiple advertisements by a single advertiser and multiple advertisements by unrelated advertisers and concludes that "[t]he different source of advertisements does not make those advertisements any less 'particular.'" Dissent at 660. This reasoning misses the mark, however. It is not the particularity of the individual advertisements that is at issue, but the particularity of the aggregate message. As to multiple advertisements by one advertiser, the aggregate message and the message of each advertisement refer to the same piece of property. Multiple advertisements by unrelated advertisers lack this specificity.

the language of section 3604(c) and the relevant HUD regulations.

HOME cites numerous cases to bolster the validity of its claim. *Ragin v. Steiner, Clateman and Assoc.,* 714 F.Supp. 709 (S.D.N.Y.1989); *Spann,* 899 F.2d 24; *Spann v. The Carley Capital Group, Inc.,* 734 F.Supp. 1 (D.D.C.1988); *Saunders v. General Servs. Corp.,* 659 F.Supp. 1042 (E.D.Va.1987). We find that these cases are either distinguishable or unpersuasive. *Saunders* involved the publication of a brochure depicting over 68 human models advertising for particular complexes owned by a single real estate organization. Any messages—whether created by individual or an aggregation of advertisements—could be traced to identifiable pieces of property owned by a single real estate organization. In contrast, defendant published numerous advertisements which were submitted by independent unrelated realtors. Under these circumstances, the instant aggregate message cannot be tied to a particular piece of property.

Neither *The Carley Capital Group* nor *Spann* expresses an opinion on a cause of action similar to the instant action. The District Court in *The Carley Capital Group* construed plaintiff's complaint to allege that defendants published advertisements that failed to include a black model, and "that in other respects ... intentional racial discrimination occurred." 734 F.Supp. at 3. Thus, it appears that plaintiff's claim was one of actual discriminatory intent bolstered by advertisements. So construed, we would agree that this would appear to state a valid cause of action under the FHA.

In *Spann,* the District of Columbia Court of Appeals addressed the issue of whether plaintiff's claim was time-barred. The court of appeals held that the District Court erred in its application of the relevant statute of limitations. The court of appeals never addressed the issue of the viability of the cause of action. Thus, this case does not help in our analysis of the instant issue.

Finally, we note that the only other circuit to address the issue—the Second Circuit—arrives at the same conclusion. The *Ragin* court stated:

> [W]e agree with the Times that liability may not be based on an aggregation of advertisements by different advertisers. Although the twenty-year pattern alleged in the complaint may have been a powerful engine for housing segregation and, if proven, will almost certainly include violations of Section 3604(c), the statute provides a prohibition only with regard to individual advertisers.

*Ragin,* 923 F.2d at 1002.

■ The statutory construction urged by HOME also fails to pass constitutional muster based on an analysis of relevant first amendment principles.[9] In general, the Supreme Court has distinguished between speech that proposes a commercial transaction and other types of speech, *Cen-*

---

9. HOME alleges that the *Ragin* court's analysis is instructive, but the *Ragin* court assumed that the individual advertisements were illegal. Once this is established, the advertisements fall outside the ambit of first amendment protection. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) (concluding that the government may ban commercial messages "that do not accurately inform the public about lawful activity"; that are "more likely to deceive the public than to inform it"; or that is "related to illegal activity"). By contrast, the instant claim concerns the publication of legal advertisements which, in the aggregate, produce an allegedly discriminatory message. Because the communication is neither related to an illegal activity nor misleading, the government's power is more circumscribed. *Id.* at 564, 100 S.Ct. at 2350.

Further, even if these advertisements were considered illegal, the District Court's reasoning does not comport with traditional first amendment analysis of commercial speech. When analyzing the constitutional protections accorded a particular commercial message, a court starts with the content of the message and not the label given the message under the relevant statute. *See, e.g., Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (analyzing first amendment protection accorded to advertisement for abortion notwithstanding statutory language making such advertisements illegal). Starting with the language of a statute would foreclose a court from ever considering the constitutionality of particular commercial speech because the statute would label such speech illegal and thus unprotected by the first amendment. Constitutional review by a court is not so easily circumvented.

*tral Hudson,* 447 U.S. at 562–63, 100 S.Ct. at 2349–50, and has concluded that the Constitution provides less protection to commercial speech. The Supreme Court has established a four-part analysis to determine the protection accorded particular commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. at 2351. We note that the speech at issue here [10] is lawful and not misleading. Further, the asserted governmental interest is substantial. *Trafficante,* 409 U.S. 205, 93 S.Ct. 364. Our chief concerns lie with the last two prongs of the analysis, the advancement of the government interest and the extensiveness of the regulations.

The interpretation of the FHA urged by HOME does little to promote the governmental interest. The purposes of the FHA are to eradicate housing discrimination and to promote integrated housing. Among other measures, the FHA prohibits discriminatory housing practices and discriminatory advertising practices for housing. The former measure attacks the root of the problem, discriminatory housing practices against certain minority groups. The prohibition against discriminatory advertising contributes to the eradication of discriminatory housing practices. Without the regulation of advertisements, realtors could deter certain classes of potential tenants from seeking housing at a particular location, effectively discriminating against these classes without running afoul of the

FHA's prohibition against discriminatory housing practices. Congress obviously recognized the key role housing advertisements play in potential real estate transactions and concluded that the regulations of real estate advertisements is warranted.

The connection between the state's interest espoused in the FHA and HOME's claim is too attenuated, however. HOME's claim does not attack an illegal housing or rental practice; nor does it target discriminatory advertisements for specific real estate. Rather, this claim purports to hold a publisher liable for the creation of a general message of discrimination not traceable to a particular advertisement. Even if such a general message is felt in a real estate market and generates a less than friendly environment for certain groups, it is difficult to determine how this message deters individuals from seeking to buy or rent specific real estate. Recognition of HOME's claim would do little to promote the purpose of the FHA. Indeed, such a claim leads to anomalous results because it would impose liability on a publisher notwithstanding that all of the advertisers complied with the FHA in their advertising practices.

In a similar case, *Linmark Assocs., Inc. v. Willingboro,* 431 U.S. 85, 95–96, 97 S.Ct. 1614, 1619–20, 52 L.Ed.2d 155 (1977), the Supreme Court struck down a township's ordinance banning the use of "For Sale" signs in front of houses. Although the ordinance sought to promote an important objective—racially integrated housing—the Supreme Court found the connection between the goal and the ban too attenuated. *Id.; see Central Hudson,* 447 U.S. at 565 n. 7, 100 S.Ct. at 2350 n. 7 (stating that "we observed [in *Linmark*] that there was no definite connection between the township's goal of integrated housing and its ban on the use of 'For Sale' signs"). We find the connection between HOME's claim based on the asserted cumulative message created and sent by multiple advertisements

---

**10.** It is difficult to define the speech at issue here. Although the instant claim implicates the speech of the individual advertisements, it does not target this speech as the basis of its liability. Rather, it is the speech "created" by the publisher through the act of designing a layout of advertisements for a page, or by publishing a series of advertisements depicting virtually all-white models, that is at issue here.

and the purpose of the FHA similarly attenuated.

Moreover, the statutory construction urged by HOME is too extensive to serve the state's interest. Expanding the statute to encompass the instant claim places a heavy burden on publishers while achieving only incidental benefits. Publishers would become the government's policemen in enforcing section 3604(c), having to ensure that advertisers and the message of advertisements individually and in the aggregate comply with this section. In this instance, newspapers would be required to achieve a proper racial mix in the layout of their advertisements.[11] A publisher would be hard pressed to determine what set of statistics upon which to rely in achieving that mix. Should proportionality be determined based on the general population in the area; based on the composition of the subscribers; or based on the composition of potentially qualified buyers in a particular area? Moreover, a newspaper would have to notify particular advertisers to use minority human models in order to achieve this proper mix of minorities in its layout of advertisements. Of course, a newspaper could simply refuse to publish advertisements with human models, an extreme policy not adopted by either the relevant statute or regulations. And this extreme act still may not shield a publisher from liability. *See Ragin,* 714 F.Supp. 709. We are reluctant to construe this statute so as to impose such burdens on a publisher or to create a policy not established by Congress or HUD.

Requiring a publisher to perform this task, as opposed to the advertiser himself or a government agency, is at odds with the traditional relationship between the government and the press. *See Bigelow,* 421 U.S. at 829, 95 S.Ct. at 2236 (noting that a claim against a publisher for publishing an abortion advertisement in violation of a statute "would impair, perhaps severely, [the newspapers'] functioning"). In light of the nominal promotion of the asserted governmental interest and the significant burden imposed upon the press, we determine that the construction urged by HOME is constitutionally infirm.

On the other hand, the construction we give to section 3604(c) serves substantially the purposes sought to be achieved by the FHA without seriously burdening publishers. To be sure, publishers remain liable for publishing an advertisement that is obviously discriminatory, including an advertisement featuring the exclusive use of a large number of all-white models; for the publication of a plurality of advertisements submitted by an advertiser that depict all-white models; or for intending to discriminate through the publication of advertisements. This potential liability does not impose substantial affirmative duties upon publishers, thereby minimizing their role as enforcers of congressional policy. This construction avoids the constitutional infirmities inherent in the construction urged by HOME. *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).

In sum, HOME's aggregation theory of liability goes beyond the language or congressional intent of section 3604(c) and cannot be supported by the regulations interpreting this section. Moreover, the viability of this cause of action hinges on a statutory construction which raises serious first amendment concerns.

We conclude that the District Court properly dismissed HOME's claims which were not based on a discriminatory advertisement or proof of a discriminatory intent by defendant.[12]

---

**11.** It should be noted that the statute's proscription is not limited to messages indicating a racial or color preference, but includes preferential messages based on religion, sex, handicap, familial status, or national origin. The statutory protection of these various groups heightens the impracticality of the approach suggested by the dissent.

**12.** In attacking the majority, the dissent points out that a member of this panel used the word "quota." Apparently, the use of this word has caused the dissent to think that our decision is based on a motive unrelated to our reasoning. This is unfortunate and unnecessary; we have forthrightly stated our reasons leading to our conclusions. Perhaps the best response to this

## III.

For the foregoing reasons, we AFFIRM the judgment of the District Court dismissing appellant's action.

KEITH, Circuit Judge, dissenting.

The majority opinion is a distressing evisceration of a remedial statute. The majority pays lip service to the salutary goal of fair housing. It reaches a result, however, which is at odds with the law and its legislative purpose of achieving fair housing opportunity. It is clear to me that the district court erred when it dismissed plaintiff's advertising discrimination complaint against the *Cincinnati Enquirer* ("*Enquirer*").

The majority parses the complaint into two separate theories and then attacks each. First, the majority states that, as a matter of law, a single advertisement cannot violate the Fair Housing Act (the "Act") for the reason that it exclusively uses white models unless the number of models is "large" and more than "select." Majority opinion at 648 n. 3 and 4, 653. Second, the majority concludes that even an aggregation of advertisements using only white models cannot constitute a violation of the Act by a publisher if the advertisements are from different advertisers.[1]

*ad hominem* argument is to quote from the relevant portion of oral argument:

Plaintiff's Attorney: Fifthly, I would submit that this court should consider the—
J. Suhrheinrich: If we go by the ordinary reader's standard, does that then require every ad to have a quota of certain minorities?
Plaintiff's Attorney: No sir.
J. Suhrheinrich: How else then does the ordinary reader look at an ad that is, say, all white, and say this is a racial preference or it isn't?
Plaintiff's Attorney: I think it is altogether possible to have one single ad that does indeed indicate a racial preference. It is a question of fact, it's a question for the jury. But, a single ad with nothing but white people in it and other symbols of exclusion or racism can indicate to the ordinary reader that—
J. Suhrheinrich: But if it's an ordinary reader, doesn't anyone in order not to be sued then must put in a quota-type system.
Plaintiff's Attorney: No sir, and the courts have said that they are not requiring any kind of proportionality that—
J. Suhrheinrich: But you say that, but any time you have an all white ad it becomes a question of fact, so one subjects himself to a lawsuit every time—under your theory—every time they have an ad that does not have minorities in it.
Plaintiff's Attorney: I think that as a practical matter that there is not going to be the mounting of a lawsuit over a single ad—
J. Suhrheinrich: But, nonetheless, that is the risk and so in order for any publisher to ensure that he is not subject to a lawsuit, then you would advocate a quota system?
Plaintiff's Attorney: Well, if he wants a thousand per cent of assurance, yes.
J. Suhrheinrich: How about just a 100%.
Plaintiff's Attorney: No system operates on that margin (interrupted)
J. Suhrheinrich: Beg your pardon?
Plaintiff's Attorney: I say, if he wants a thousand percent assurance that he's not going to be sued, yes, the answer is yes—

J. Suhrheinrich: If you were their lawyer, that's what you would instruct them to do?
Plaintiff's Attorney: I wouldn't necessarily instruct them on that, no. Because I think that they would be ... anybody would be foolhardy to sue over a single ad that did not have a minority represented because the newspaper is going to be entitled to the instruction that strict proportionality is not required.

\*      \*      \*      \*      \*      \*

Plaintiff's Attorney: Judge Suhrheinrich, in response to the question of whether or not each ad would have to have a, what you call a "quota" of minorities—
J. Kennedy: Well, at least a representation of a minority.
J. Suhrheinrich: I understand that that's kind of an inflammatory word maybe today, but, and I don't mean it that way in that, I'm just grasping for what is the standard here and how you fulfill it.

\*      \*      \*      \*      \*      \*

J. Keith: I'm just sorry that my colleague and friend Judge Suhrheinrich used the word "quotas" because that is a bad word and it is one that just sets fire in the minds of white Americans, and I don't think there is anything in here about quotas. We're talking about 20 years of a pattern that may or may not prove a pattern that discriminates and what the plaintiff's are asking—that let this matter go before court or a jury and determine as a factual matter whether, in fact, this is so. The dictionary supports the use of this word in the instant context. Webster's Third New International Dictionary defines "quota" as "1: a proportional part ... 4: a fixed number or percentage of minority group members who may be admitted into some activity or institution...."

1. The district court held that a party must show discriminatory intent unless an advertisement showed a discriminatory preference which is obvious. *Housing Opportunities Made Equal,*

I disagree. While perhaps not all advertisements in which all of the models are white would violate the Act, it is a factual issue whether some of the advertisements violate the Act. Further, I interpret the Act, which extends its prohibition of discriminatory use of models not just to the advertiser, but to the publisher, to similarly extend liability to the publisher for an indication of racial preference which is apparent only when looking at an aggregation of advertisements. Accordingly, I respectfully DISSENT.

## I.

There has been no trial in this case. The only issue is whether plaintiff should have an opportunity to present its case. Plaintiffs have broad latitude in filing a complaint. The court must accept as true all factual allegations in the complaint. The motion must be denied unless plaintiff "undoubtedly can prove no set of facts in support of [its] claims that would entitle [it] to relief." *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 475 (6th Cir.) (citations omitted), *cert. denied,* — U.S. —, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990).

The majority distorts HOME's claim and ignores the proper legal standards for a Fed.R.Civ.P. 12(b)(6) motion in order to dismiss and thereby reaches a ludicrous result. In the majority's attack of HOME's first argument, it states that the exclusive use of white models could be a factor in determining whether an advertisement violates the Act, but finds that the exclusive use of white models alone cannot state a claim under the Act. The majority argues that there is a fixed number, so far only defined as large and more than select, at which it believes that an issue of fact

arises from the exclusive use of white models. Majority opinion at 648 n. 3 and 4, 653. This interpretation completely ignores the text and purpose of the Act.

## A.

The Act provides that "[i]t is the policy of the United States to provide ... for fair housing throughout the United States." 42 U.S.C. § 3601. The Act makes the following practices unlawful:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

Consistent with the Act's remedial purposes, the Department of Housing and Urban Development ("HUD") has promulgated regulations pursuant to the Act which address the issue of human models used in advertisements. *See* 24 C.F.R. §§ 109.25–.30. The regulations state in part:

> Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex, handicap, familial status, or national origin. If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an

Inc., v. Cincinnati Enquirer, Inc., 731 F.Supp. 801, 804 (S.D.Ohio 1990). The majority opinion concedes that courts which have addressed the issue have held that intent is not a necessary element of a violation of § 3604(c). Majority opinion at 646. The Act prohibits publication of any real estate advertisement "that indicates any preference ... based on race...." 42 U.S.C. § 3604(c). In fact, three circuits, giving the verb "indicates" its common meaning, have held that the statute's language dictates that the Act is violated if the housing advertisement suggests to

an ordinary reader that a particular race is preferred or dispreferred for the housing. *Ragin v. New York Times Co.,* 923 F.2d 995, 999 (2d Cir.1991); *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 29–30 (D.C.Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990); *United States v. Hunter,* 459 F.2d 205, 215 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). *See also Fenwick–Schafer v. Sterling Homes Corp.,* No. R–90–1376, slip op. at 5 (D.Md. Mar. 28, 1991).

equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status or national origin, and is not for the exclusive use of one such group.

24 C.F.R. § 109.30(b).

As an example of advertising which may be discriminatory, the regulations state that "[s]uch selective advertising may involve the use of human models of members of only one sex, or of adults only, in displays, photographs or drawings to indicate preference for one sex or the other, or for adults to the exclusion of children." 24 C.F.R. § 109.25(c).

Moreover, HUD stated in its response to comments on 24 C.F.R. §§ 109.25(c), 109.-30(b):

> The term "reasonably representing" is inten[de]d to assure that models will convey a message of general inclusiveness of persons covered by Title VIII, not literal display of each minority group. For example, *use of two white models, one male and one female[,] would not convey such inclusiveness.* In a small town with no minority groups other than blacks, however, use of two models of different sexes, one white and one black, would "reasonably represent" majority and minority groups of both sexes.

45 Fed.Reg. 57,105 (1980) (emphasis added).

### B.

Plaintiff's complaint alleges that the use of human models personalizes the adver-

tisement and encourages consumers to identify themselves in a positive way with the models and housing featured. It further states that human models often represent actual or potential purchasers or renters, or the type of potential purchasers or renters that the real estate owner has targeted as desirable occupants. Joint Appendix at 9 (Complaint para. 14). HOME asserts two claims. First, HOME alleges that the Enquirer violated the Act by publishing advertisements that contained white models only. The complaint in paragraph nine alleges that in group photographs in the real estate section, the groups consist exclusively of white people. Joint Appendix at 7. Second, HOME alleges that the *Enquirer* violated the Act because it published advertisements that in aggregation produced a virtually all white advertising spread.

### II.

With regard to the first claim, HOME does not claim that any advertisement in which all of the models are white is in violation. Rather HOME properly claims that it is an issue of fact whether a reasonable person, looking at *some* of the advertisements that HOME would undoubtedly present as proof at trial, would find that the exclusive use of whites in the particular advertisements indicates that whites are preferred tenants or purchasers.[2] HOME's

---

**2.** I disagree with the majority's interpretation of the section of transcript provided in the majority opinion at footnote four indicating that the only claim by HOME is the aggregation claim, to the ·exclusion of the single advertisement claim. I understand the plaintiff's attorney's agreement to the panel's interpretation of the complaint to be limited to the second issue on appeal. Thus plaintiff's attorney agreed that Judge Kennedy had properly summarized the second claim, but was not disavowing the first issue on appeal concerning a single advertisement. In oral argument, both judges in the majority explicitly stated that they understood HOME was making two arguments in the alternative.

> Defendant's Attorney: Your honor, I heard [HOME's] counsel concede to the court that there was no single ad that had been placed

which on its face expressed a racial preference or indicated a racial preference.

> J. Kennedy: I'm not sure he did. I think he's saying that any ad that does not include a minority expresses on its face a racial preference.

> Defendant's Attorney: Your honor, if that's the case then I submit that is an incorrect interpretation of the law because the law has not yet indicated that a single ad which shows for example a group of white people; two three, whatever would be in effect expressing a racial preference. In fact, I heard Mr. Newman concede that the only way that would express a racial preference is if it were accompanied by some other indication some other symbol expressing a racial preference.

> J. Suhrheinrich: You might have heard him different from me, but I was trying to pin him all down and I thought he came back ulti-

claim satisfies the requirements of the Act. The majority is proclaiming a per se rule that such advertisements *never* could cause a reasonable person to feel excluded, unless some other factor, such as repetition by a particular advertiser, were added or the number of models is "large."

### A.

The crux of the dispute between the majority and dissent on this point is as follows. The dissent believes it is an issue for a fact finder whether an advertisement containing white models exclusively indicates a preference. At least it should be determined on summary judgment whether a reasonable fact finder could find a preference. The majority insists on a set minimum number of models that must be alleged in a complaint. The majority, however, fails to disclose the judicially mandated *minimum number of models*. Thus it appears that the majority wishes the plaintiff to refile the complaint specifying the number of models in the group photographs which contain white models only. On a subsequent appeal, the majority will decide whether it believes the alleged number is enough to allege a violation of the Act entitling plaintiff to an answer. If the majority believes there is a fixed number of models in an advertisement with white models only which is required as a minimum for a claim to be stated, it seems as a matter of judicial economy that the number should be stated.[3]

All that the language of the Act requires is that the advertisement indicate a prefer-

ence. HOME has alleged that advertisements in the *Enquirer* indicate a preference. It has substantiated that claim with further allegations that the *Enquirer* has printed advertisements with white models only and that some of these advertisements included group pictures. The majority says that this is still not enough even to make it a factual dispute whether or not the advertisements indicate a preference. With no basis in the statute, it insist that there must be a "large" number of models in order for any reasonable person to conclude that an advertisement that exclusively uses white models indicates a preference.

The complaint in the instant case alleges a long-standing pattern of publishing advertisements with white models only, including group photographs. The Second Circuit stated in *Ragin,* concerning a complaint nearly identical to that filed by HOME,[4] "[g]iven the ordinary reader test, it can hardly be said that these allegations are insufficient...." *Ragin v. New York Times Co.,* 923 F.2d 995, 1001 (2d Cir.1991). The Second Circuit in *Ragin* held that "a trier plausibly may conclude that in some circumstances ads with models of a particular race and not others will be read by the ordinary reader as indicating a racial preference." *Id.* at 1000. I believe the law mandates the Sixth Circuit reach the same conclusion.

The majority quotes *Ragin* out of context from where the *Ragin* court stated that an advertisement featuring a couple of one race would seem insufficient as a matter of law for a claim under § 3604(c).

---

mately and said that a single ad could be in violation and that is where I used perhaps the wrong kind of word, but I said then you're talking about a quota.

**3.** I believe it is beyond the scope of this case whether a hypothetical complaint that just alleged the publication of one advertisement with one or two white models would be sufficient to survive a rule 12(b)(6) dismissal. That issue is not presented in the instant case and therefore I do not reach it. I note that the regulations conclude that a picture with two models, both white, would not portray inclusiveness and may indicate a preference. 45 Fed.Reg. 57,105; *infra* section II–B. The complaint in the instant case alleges a long-standing pattern of publish-

ing advertisements with white models only, including group photographs. As the Second Circuit stated in *Ragin,* "[g]iven the ordinary reader test, it can hardly be said that these allegations are insufficient...." *Ragin,* 923 F.2d at 1001.

**4.** The complaint in *Ragin* also alleged that in the few pictures including black models, blacks were usually depicted as maintenance employees, doormen, entertainers, sports figures, small children or cartoon characters. *Ragin,* 923 F.2d at 998. While such allegations were not present in the instant complaint, there is no indication that the *Ragin* court relied on this part of the allegations in reaching its decision.

Majority at 648. The *Ragin* court found that the complaint in that case could not be dismissed based on allegations, like those in the instant case, of only one percent of black models over a twenty year period. The quote excerpted by the majority appears in the section of the *Ragin* opinion, after the court has concluded that the motion to dismiss must be *denied*, where the court provided guidance to the district court on how to evaluate the evidence admitted during the trial of the case. *Ragin*, 923 F.2d at 1001–02. While I might disagree with how the *Ragin* court would evaluate the evidence under § 3604(c), we are in agreement that the issue presented in the instant case—whether pictures using exclusively white models would cause a reasonable black person to feel that people of another race are preferred clients—is a dispute to be determined on the evidence submitted, not on a motion to dismiss.

The *Ragin* court correctly notes that all that is required of plaintiff's claim is that it is plausible. As the Second Circuit noted, "[o]rdinary readers may reasonably infer a racial message from advertisements that are more subtle than the hypothetical swastika or burning cross, and we read the word 'preference' to describe any ad that would discourage an ordinary reader of a particular race from answering it." *Ragin*, 923 F.2d at 999–1000. It is clear to me that a reasonable person could conclude that advertisements that picture white models only could lead a black person to conclude that whites are preferred clients.

The Second Circuit has recognized that the relevant question is whether a member of an excluded race would feel excluded. The test is not whether a member of the included race would feel excluded. *Id.* After all, the Act, by addressing advertisements as well as the actual sale and rental, targets self-selection by readers which occurs before the initial inquiry. *Id.; Hunter*, 459 F.2d at 214–15. This self-selection occurs when members of the excluded race do not even bother to apply for the property advertised because the advertisement implicitly communicates that the included race is preferred. I conclude that if advertisements with white models only were

presented to a jury, the jury could reasonably find a preference.

In addition to presenting the advertisements for the jury to evaluate, plaintiff is also entitled to support its claim with expert testimony. Expert testimony might demonstrate the subconscious effects of advertisements with models. An expert might demonstrate that despite the absence of a conscious message, the subconscious message of such an advertisement is to indicate a preference. *See Saunders v. General Servs. Corp.*, 659 F.Supp. 1042, 1058 (E.D.Va.1987). The majority made its factual finding without an opportunity to listen to this testimony. In substituting its judgment for the jury's, it concludes that it would not receive a message of exclusion by looking at an exclusively white advertisement unless the number of models alleged was "large."

Models used in print advertising are designed to send a message to the reader. *See Saunders*, 659 F.Supp. at 1058. But even if the messages were unintended, and, therefore, purely accidental, the exclusive use of white models sends the subtle but distinct message of racial exclusion. "Blacks need not apply." "Blacks are not welcome."

The ability of exclusive advertising to transmit these messages of preference is so obvious as to require no citation of authority. Nevertheless, I note the *Saunders* court's analysis in this area is particularly cogent. Judge Merhige described a housing brochure that had almost no black models. He discussed expert witness testimony regarding this issue as well as the defendant's rationalizations. *Saunders*, 659 F.Supp. at 1058–59. In that case, Judge Merhige concluded that the "natural interpretation" of a rental housing brochure virtually devoid of black models was "to indicate that [the subject] apartment complexes are for white, and not Black tenants, thus discouraging Blacks from seeking housing there." *Id.* at 1058. The majority distinguishes the message sent by the exclusive use of white models when there are many models from the message sent when there is only a "select" number.

The majority has presented no authority for this distinction. This distinction assumes that blacks looking at advertisements that picture exclusively white models would not feel that another group is preferred unless the advertisement includes a large number of models. The majority certainly has not shown that the scientific community considers this assumption indisputable. I, therefore, conclude it is a factual issue.

### B.

The regulations also demonstrate that exclusivity of models in an advertisement may indicate a racial preference, thus violating the Act. As an example of advertising which may be discriminatory, the regulations state that "[s]uch selective advertising *may* involve the use of human models of members of only one sex, or of adults only, in displays, photographs or drawings to indicate preference for one sex or the other, or for adults to the exclusion of children." 24 C.F.R. § 109.25(c) (emphasis added). Thus picturing one group and not another is one of the few prototypes of discrimination listed in the regulations. Admittedly § 109.25(c) says "may," but that thereby indicates that it is ultimately a question of fact to be decided by the fact finder. While not conclusive, such depictions certainly raise a plausible question to be decided by a jury.

Additionally, HUD's response to comments on the regulations makes it very clear that exclusivity of models in an advertisement may indicate a racial preference. Specifically, HUD concluded that an advertisement with *two* models, both white, would *not* convey inclusiveness, thus possibly indicating a preference. 45 Fed.Reg. 57,105 (1980) (quoted *supra* at 656). While

the comment may be only a guideline and not a strict rule of liability, it is clear to me that HUD has determined that such advertisements at least raise a factual issue as to whether they indicate a preference. The majority has found HUD's determination beyond the pale of the reasonable.

This case is here on a motion to dismiss. In that context, the argument made by the majority is absurd. This is not even a motion for summary judgment where the court would at least be determining which decisions a reasonable jury could make on the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Here the facts and inferences must be assumed in plaintiff's favor. *Meador*, 902 F.2d at 475. It is a question of fact whether a reasonable person of the excluded race would look at the advertisements and see a preference. Therefore a Rule 12(b)(6) dismissal is unquestionably improper.[5]

The dispute over this claim revolves on the majority's inability to see that people in the minority, when excluded, are likely to feel that others are preferred. The majority has recognized that if there is a large number of whites and no blacks then the blacks are perhaps conspicuously absent. It fails to recognize that even when the numbers are few, the minority viewer still sees an advertisement that features others, but excludes people like him or her.

Congress left liability under the Act to the decision of a reasonable fact finder. HUD determined that in fact a small number of models, if not reasonably representative, is suspect. Courts that have examined complaints alleging pictures of models without minorities have found these allega-

---

5. While I mention the standard for determining summary judgment to highlight the sufficiency of HOME's claim to avoid dismissal under Rule 12(b)(6), the evidence discussed above and the possibility of the expert testimony indicate to me that not only is there an issue of fact in this case, but that there is a genuine issue of material fact. Thus not only is Rule 12(b)(6) dismissal inappropriate, Rule 56 summary judgment also appears inappropriate even if evidence beyond

the complaint were considered. The higher standard of genuine issue of material fact only applies to summary judgment motions when documents beyond the pleadings are considered. *See Blum v. Morgan Guar. Trust Co. of N.Y.*, 709 F.2d 1463, 1446 (11th Cir.1983); *United States ex rel. Simmons v. Zibilich*, 542 F.2d 259, 260 n. 3 (5th Cir.1976); *Franklin & Joseph, Inc. v. Continental Health Indus., Inc.*, 664 F.Supp. 719, 720 (S.D.N.Y.1987).

tions were sufficient for a claim. The majority, however, refuses to recognize even the plausibility that members of a minority group, looking at an advertisement for housing with members from the majority and not members of the minority, might reasonably feel that the advertiser would prefer someone else. It is very disappointing that this Court insists on taking such a course.

## III.

The majority also rejects HOME's second claim, that the *Enquirer* violated the Act because the aggregate of real estate advertisements displayed by the *Enquirer* contains almost exclusively models who are white. The majority presents an unsupportable argument to achieve this result, relying on statutory language, the regulations adopted by the concerned agency (HUD), and the purpose of the Act. I find that all three of these considerations indicate that HOME has alleged a claim cognizable under the Act.

## A.

Turning first to the statutory language, the Act declares it unlawful to publish "*any* notice, statement, or advertisement, with respect to the sale or rental of a dwelling" that indicates a racial preference. 42 U.S.C. § 3604(c) (emphasis added). The majority wishes to read the prohibition of "any" "advertisement" to be limited to particular advertisements and therefore the Act does not prohibit advertisements which collectively create such an inference. Majority Opinion at 649–50. I find this a

tortured construction that inappropriately limits the ordinary meaning of a prohibition of "any" advertisement. Just as "any" advertisement applies to someone who submits more than one advertisement that indicates a preference, it also applies to advertisements in the plural which create such a preference. The plural is incorporated in the "any" construction.

The majority concedes that multiple advertisements by one real estate operator could violate the Act. "To be sure, publishers remain liable for ... publication of a plurality of advertisements submitted by an advertiser that depict all-white models." Majority Opinion at 653. This concession belies the distinction the majority tries to make to carve aggregation claims out of the Act. Once the majority concedes that the Act provides for liability of an advertiser that cannot be determined without looking at a collection of advertisements over a period of time, it has undermined the argument it tries to weave out of the statutory language. The majority wishes to draw a line where the statute clearly does not provide one. The majority finds it appropriate to look at several advertisements from the same advertiser to determine whether in total the collection of several sequential advertisements indicate a preference. Such an examination is looking at "particular" advertisements no more than if it looked at the several advertisements by different advertisers published on the same page to determine whether that collection of "particular" advertisements would indicate a preference. The different source of advertisements does not make those advertisements any less "particular."[6]

---

**6.** In footnote eight, the majority argues that it does not require particularity of the *advertisement,* but of the message. On page twelve in its statutory argument, however, it complains that "[a]lthough implicating advertisements in general, [the aggregation] claim does not depend upon a finding that any particular *advertisement* is discriminatory." Majority opinion at 650 (emphasis added). This appears contradictory. The majority argues that particularity of *advertisement* is required by the statute but disclaims this in footnote eight. As demonstrated supra in this section, the statute simply does not require such particularity. The majority concedes this in the footnote.

The majority's argument in footnote eight seems to speak to the dissent's response to the majority interpretation of the regulations discussed *infra* at section III–B, not the statute as discussed here in section III–A. Majority opinion at 650. With regard to the majority's regulations argument, particularity as to *message,* as the majority defines it, is also met. *See infra* section III–B. The majority argues that HOME has not stated a claim because the majority reads the regulations to require that the aggregate message and the message of each advertisement refer to the same piece of property. Majority opinion at 650 n. 8. I disagree for two reasons.

Plaintiff has certainly pointed to particular advertisements. It has pointed to the advertisements published in the real estate section of the *Enquirer* over a period of years. These are advertisements that may be presented to the jury. The fact that they are numerous does not make them any less particular. They can be individually designated. Certainly the prohibition on "any" advertisement cannot be read to put an upper limit on the number of advertisements that may be introduced to demonstrate discrimination.

### B.

The majority's analysis of the relevant regulations, 24 C.F.R. §§ 109.25, 109.30, similarly attempts to distinguish HOME's claim on the ground that the regulations refer to "advertising campaigns." The majority targets the word "campaign." It finds in this word a requirement for reference to a particular set of advertisements referring to a particular set of property. It then contends that an advertising campaign, so defined, is the exclusive means by which more than one advertisement can constitute a violation of the Act. First, as noted above in section III–A, HOME has pointed to specific advertisements which in turn feature particular properties, numerous though the advertisements may be. Second, § 109.30(b) dictates that "[h]uman models in photographs ... may not be used to indicate exclusiveness because of race...." 24 C.F.R. § 109.30(b). This is a

broad prohibition not restricted to particular advertising campaigns and is the topic sentence of the subsection. The subsection continues that in advertising campaigns the use of models should be representative of the metropolitan area. *Id.* There is nothing in the regulations that indicates that it is in fact permissible to use pictures to indicate exclusiveness as long as it is not used in a "campaign." Yet that is the construction the majority urges.

In trying to carve out an exemption in the statute for the violations alleged against the *Enquirer,* the majority desperately grasps at the regulations to create a requirement that the discriminatory message be focused on a particular property. The majority defines "advertising campaign" to be limited to several advertisements concerning the same property presented by the same advertiser. The regulations simply do not support the existence of the majority's judicially crafted requirement. The regulations state a broad prohibition against the use of models to indicate exclusiveness. If the models indicate exclusiveness, the advertisement is prohibited. This prohibition is not limited to only those indications of exclusiveness that are connected to a particular advertisement or particular piece of real estate.[7]

### C.

Once it is conceded, as logic, language, regulations and purpose dictate, that a ser-

---

First, the regulations do not state that this identity between the aggregate message and the message of each advertisement must exist. I assume that the majority somehow also reads this identity requirement into the word "campaign." *See infra* section III–B. In fact, it is a judicial creation of the majority.

Second, even if the regulations did require the aggregate message and the message of the individual advertisements to refer to the same property, the plaintiff has met this standard. The aggregate message refers to all the property in the *Enquirer's* display layout. It states that blacks are dispreferred customers to rent the properties advertised. If blacks see that they are excluded from the advertisements in the *Enquirer,* they will get the message that members of the race pictured are preferred and, therefore, will not even look in the *Enquirer* when seeking a home. The aggregate message is to steer them away from the individual properties advertised in the advertising display lay-

out. Collectively the individual advertisements in the layout refer to all the properties advertised in the *Enquirer.* This is the same property that the aggregate message says is offered on a preferential basis to a group other than blacks.

7. Even if such a requirement existed, the allegations in this complaint are linked to the properties advertised in the *Enquirer,* as noted in the previous section. *See supra* section III–A. Some of those advertisements are by the same advertiser for the same property. Admittedly the complaint does not specify this information, as conceded at oral argument. It seems to me that even if the majority limits the restriction of the Act to "campaigns" and limits "campaigns" to advertisements for the same property, the appropriate resolution for this case would be to remand the case for an amendment of the pleadings.

ies of advertisements can collectively indicate discrimination, then liability must also apply to publishers of the collective message of advertisements. This is clear from the structure of the Act which provides for liability of the publisher separate from that of the advertiser. The statute is not written, as the majority implies, to prohibit a real estate vendor or advertiser from discriminating, and if he or she does so, then to provide for liability of the publisher as well. Rather, the statute prohibits both parties, equally and individually, from discriminating. Thus if the *Enquirer* publishes a spread of advertising that when examined together indicates to the reasonable reader that certain groups are preferred, the *Enquirer* has violated the Act *regardless* of whether individual advertisers have also violated the Act.

According to the complaint, the *Enquirer* has a history of running advertisements which depict white models almost exclusively. Paragraph 9 of the complaint states:

> At least 34% of the population of the City of Cincinnati is Black. 19% of Hamilton County is Black. 12% of the Metropolitan Statistical area is Black. During the twenty year period since the Act was passed prohibiting discriminatory advertisements, display advertisements have appeared in the Sunday *Enquirer* featuring hundreds of human models of whom virtually none were Black. Nearly all advertisers in the real estate section who have advertisements with human models depict only whites. In group photographs in the real estate section the groups consist of exclusively white people. Of all of the advertisements displaying human models less than 1% include a Black person.

Paragraph 15 of the complaint states:

> From November 8, 1987 to October 15, 1989 there were approximately 1000 separate advertisements with human models in the Sunday Real Estate Section of the *Cincinnati Enquirer*. Only nine of such ads have one or more Blacks appearing.

Joint Appendix at 7, 10.

How can the majority possibly hold that the *Cincinnati Enquirer's* all white advertisements fail to indicate to an average reader that blacks are not welcome to buy or rent housing in the places advertised in the *Enquirer?* It is not an accident that 99% of the models depicted in real estate advertising are white. Advertising agencies and real estate developers do not make marketing decisions casually. In fact, unlike the sale of clothes, there is no need at all for human models in the sale of real estate. Given the absence of a need for these models, when models are present the advertisements convey that the models are used for an improper purpose—to communicate a racial preference. Conveying racial preference is improper regardless of whether or not the advertiser or publisher actually intended to do so.

If the same or related [8] advertisers or *publishers* repeatedly and exclusively use white models, that strikes me as indicating a racial preference. This common sense likelihood is not addressed at all in the majority opinion. The majority refuses to examine the *Enquirer's* display for discrimination unless it first finds discrimination on the part of an advertiser. The majority can point to nothing in the Act or the regulations, however, that limits the publisher's liability to only derivative liability. Publishers and advertisers are both liable if the display they present indicates a preference. HOME has alleged that the display published by the *Enquirer* shows few blacks, thus indicating a preference. HOME is entitled to have a fact finder determine whether a reasonable inference from the display is that blacks are not preferred.

---

8. By "related advertisers" I am referring to different buildings with the same owner or manager. For example, two condominium complexes which submitted separate advertising but are owned by the same party. The same result would be achieved if the owner or manager were considered the "advertiser" and therefore it would only be one advertiser with multiple properties.

## D.

It is absolutely clear to me that the message conveyed by the pattern of segregated advertisements denominated in the complaint is that blacks need not apply. The effect of this message is to preserve the status quo of racially segregated housing. The purpose of the Fair Housing Act "was to replace the ghettos by truly integrated and balanced patterns." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972) (citing Senator Walter Mondale 114 Cong. Rec. 3422). The construction of the Act set forth in this dissent advances this goal. The construction set forth by the majority does not.

I recognize, of course, that it is the advertising agency or developer which presents advertisements to the *Enquirer*. The exclusive use of white models in the advertisements simply reflects biases that are present in certain segments of American society. The purpose of the Act, however, is to prohibit the manifestation of these biases. The *Enquirer* is an excellent newspaper. I am not suggesting that it is intentionally biased against blacks. In fact, I believe the contrary. But the *Enquirer*, like other leading newspapers, has sadly failed to review its display advertising to screen out the racially biased messages it sends. The Fair Housing Act is certainly broad enough to address these messages.

## IV.

The majority argues that to attribute liability to publishers for the aggregate message they publish would violate the first amendment.[9] I certainly take first amendment concerns seriously. But this statute, as properly interpreted to impose liability for publishers who violate the Act by an aggregate of advertisements, simply does not unduly burden first amendment interests. The majority correctly cites the analysis set forth in *Central Hudson Gas Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562–64, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980), to determine the first amendment protection warranted for this commercial speech. However, the majority completely misapplies this analysis to the facts alleged here.

## A.

The first prong of the *Central Hudson* test is whether the commercial speech concerns lawful activity and is not misleading. Any speech that concerns unlawful activity is not protected. *Id.* at 563–64, 100 S.Ct. at 2350. I disagree with the majority's view that the aggregate message of racially exclusive housing concerns lawful activity. The majority implicitly defines the relevant activity as simply the sale of real estate. The speech in the instant case concerns the sale and rental of real estate in a racially discriminatory manner. In other words, it is speech that promotes the illegal result of housing sale and rental on a discriminatory basis. For this reason alone, as commercial speech it loses its first amendment protection and HOME's claim therefore does not impinge on first amendment rights.

## B.

Even if, arguendo, the speech concerns legal activity, the speech is not protected because the Act meets the rest of the *Central Hudson* test. If the Act concerns a substantial government interest, directly advances that interest, and is not more expansive than necessary to achieve that interest, the restriction on commercial speech will be constitutional. *Id.*

9. The majority concedes that the first amendment concerns apply only to the second, aggregation, claim. Majority Opinion at footnote 9. I note that in footnote 9 of the majority opinion, the majority falls victim to the circular argument alluded to and explicitly distinguished in *Ragin*. *Ragin* did not find that the advertisements were not protected because they were illegal, rather the advertisements were *not* protected because the activity they were promoting, discriminatory sale of real estate, was illegal. As the *Ragin* Court and the *New York Times* in *Ragin* noted, a test that simply asked whether the speech had been made illegal to determine whether the ban was unconstitutional would be self-fulfilling. *Ragin*, 923 F.2d at 1002.

### 1.

The majority concedes that the government interest in promoting fair housing and halting discriminatory housing is substantial. It contends, however, that the regulation does not directly advance the government interest. I find the majority's assertion indefensible. It is doubtless that the prohibition of discriminatory aggregate messages of exclusion directly effectuates accomplishing that goal. The majority asserts that HOME's claim is too attenuated from the goal of fair housing because it interprets HOME's complaint to assert that the challenged advertising message need not be directly traceable to a particular advertisement for a specific plot of real estate. The majority says that even if the message permeates the market and generates a "less than friendly" environment for a certain class, "it is difficult to determine how this message deters individuals from seeking to buy or rent specific real estate." Majority Opinion at 652. This task is not difficult at all. If blacks find that they are not pictured in the advertisements in the *Enquirer*, they likely, as the facts have shown in other trials, will get the message that they are not welcome and members of the race pictured are preferred. *See supra* section III–A. Thus they will not respond to those advertisements and likely will not even look in the *Enquirer* when seeking a home; they will be steered to consult other sources for available housing that do not act as a deterrent.

The majority claims that it would be "anomalous" for the publisher to be liable when all the advertisers complied with the Act. Majority Opinion at 652. Even assuming that hypothetical situation, which is very unlikely considering the statistics presented by HOME, the outcome is not anomalous at all. It is simply the result of recognizing that there is a separate message in the aggregate that may not be conveyed by each of the several parts. Indeed, it is the effectuation of the provisions of the Act. In fact, the structure of the Act indicates that this outcome is not at all anomalous. As noted in section III–C, the statute prohibits both advertisers and pub- lishers equally and individually from discriminating. The publisher's liability is clearly not derivative of that of the advertiser.

The majority asserts that the instant case is analogous to *Linmark Assocs. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), where the Court held that a regulation prohibiting a "For Sale" sign was too attenuated from the goal of integrated housing to withstand a first amendment challenge. *Id.* at 95–96, 97 S.Ct. at 1619–20. The majority notes that the Supreme Court in *Central Hudson* found that there was no definite connection between the goal and the ban. Here there is a definite connection. A ban on aggregating advertisements in a way that the interpretation by a reasonable reader is that one race is preferred clearly addresses the goal of integration. Without such a ban those dispreferred will seek housing other than that advertised in the *Enquirer*. The result will be that those seeking a home in the places advertised in the *Enquirer* will be disproportionately from the preferred group.

### 2.

The majority contends that another part of the *Central Hudson* test is not met— that the statute is more extensive than necessary to serve the interest it furthers. In support of its contention, the majority posits a parade of horribles that is far overstated. The majority postulates that the Act applied to aggregate messages by publishers would force the press to become the government's police. It points out that the only way the press could regulate its message would be to keep abreast of minority statistics. The majority conjures a distressing quest to determine which geographical area is relevant to determine a reasonable racial mix. It also finds it a heavy burden for a newspaper to notify a particular advertiser that it must submit an advertisement without models or use minority models in order to comply with anti-discrimination laws.

I disagree that a heavy burden on newspaper publishers would result if publishers

could be liable for advertisements which when aggregated send a discriminatory message. Newspapers review advertising under a variety of objective and subjective criteria. No reputable newspaper such as the *Cincinnati Enquirer* publishes false or deceptive advertising. No reputable newspaper publishes advertising with offensive language. No reputable newspaper publishes advertising which is clearly unlawful. Given the extensive monitoring that a reputable newspaper necessarily performs, there is little additional burden in seeing to it that discriminatory messages are not sent in print advertising.

The majority opinion is myopic in its approach and has little support in law, policy or in legislative history. The majority speaks of a concern for the efforts necessary to get a proper racial mix. While the majority does not use the word quota in the opinion, the word was used from the bench in oral argument by a member of the majority. It is apparently a concern about quotas that frightens the majority. The word "quota" is a code word for an inflammatory concept that is used by those opposed to affirmative action and fair housing. The majority knows that the prospect of creating a quota is ludicrous and injects into this litigation a concept which draws on the worst instincts and behavior of many American citizens. This case is about advertising and fair housing. We are called upon to determine whether this plaintiff's claim states a cause of action for violating the Fair Housing Act and whether this plaintiff is entitled to its day in court. All one has to do is look at a changing neighborhood and see the housing signs that go up when the landlords want blacks to apply. The signs usually say *"all are welcome."* We know what that message means to black Americans. It means that racially restrictive housing practices have been abandoned and blacks will not be precluded from living in the residence of their choice.

The majority is concerned that monitoring real estate advertising could require establishing a proper racial mix. I see no such problem.

First, no particular number is required. I think that any reasonable figure could be a bench mark, including either the percentage of blacks in the City of Cincinnati itself or in the metropolitan area. HUD's regulations suggest a reasonable representation of the metropolitan area. 24 C.F.R. § 109.-30(b). Statistics on racial compositions of metropolitan areas are readily available. *See,* Bureau of the Census, U.S. Dep't of Commerce, Statistical Abstract of the United States 33–36 (1990). There exists a zone of reasonableness that should present little or no problem for newspapers or advertisers.[10] Put another way, as a matter of law, the use of models *reasonably* reflecting community makeup would not indicate a racial preference to the average reader. What I do think indicates a racial preference to the average reader is the infinitesimal use of black models, as the complaint alleges. Ironically and unfortunately, the majority drags out the quota bug-a-boo while it is unconcerned that the *Cincinnati Enquirer* has less than 1% black models in its real estate advertising.[11]

It is true that a newspaper could be confronted with many advertisements each

10. Courts, for example, have long applied a zone of *reasonableness* test in reviewing voluntary affirmative action plans. *See, e.g., United Steel Workers v. Weber,* 443 U.S. 193, 212, 99 S.Ct. 2721, 2731, 61 L.Ed.2d 480 (1979); *Baker v. City of Detroit,* 483 F.Supp. 930, 991 (E.D.Mich.1979), *aff'd sub nom Bratton v. City of Detroit,* 704 F.2d 878, 892 (6th Cir.1983), *on rehearing,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

11. The majority's concern with quotas reflects a knee-jerk response by some Americans who believe that any time there is a requirement that blacks be included in any but token numbers, the result will be the creation of quotas. While it is always possible for a potential defendant to

independently set fixed numbers as a means of preventing inclusion of only a small number of blacks, it remains true that an equally effective way to prevent liability is to cease discriminating or cease to let discrimination affect the potential defendant's operations.

Publishers in the instant case could cease accepting advertisements with models. As other courts have noted, models are a carefully used tool in advertising to get a potential customer to relate to the model. *See Saunders,* 659 F.Supp. at 1058–59. Unlike clothes, there is certainly no need for human models to advertise real estate. Should a publisher decide that it will accept advertising which uses human models, the statute and regulations require that the advertising

**666**

from a different real estate vendor and each featuring only one or two white models, thus perhaps not facially indicating a preference. It does not appear to me to be an unacceptable burden to require the newspaper to ask some of its advertisers to include minority models or refuse to print the advertisements when the alternative is a newspaper spread that says to minority Americans, "We prefer to sell and rent to members of another race." This is not simply a ban on discriminatory speech; the Act prohibits the press from furthering commercial transactions that are discriminatory by providing to advertisers who print in their newspaper a group of prospective clients that has been pre-screened to exclude minorities.[12]

V.

Discriminatory housing is a fact of life. In fact, there has been little progress in combatting housing discrimination in the last ten years. All one has to do is look at some of the major cities in the country—Washington, D.C., Philadelphia, Baltimore,

New York City, Chicago, Detroit and Los Angeles, for example—to support this proposition.[13] Congress chose to dismantle artificial barriers to integration in order to give blacks and other minorities complete access to housing. The complaint filed by plaintiff highlights a serious and troubling problem—the perpetuation of racially biased messages by some of our leading newspapers.

The majority chooses to immunize newspapers from liability in all but the most egregious cases. In the process, the majority narrowly construes an act that Congress decreed should be construed to effectuate the broad purpose of fair housing. 42 U.S.C. § 3601.

For the reasons set forth above, I believe that this complaint fairly states a cause of action for violation of the Fair Housing Act. I would reverse and remand for further proceedings.

reflect inclusiveness and not indicate a preference. This is not a test of exact matches to population figures. It is a non-numerical impression that will result if the pictures reflect a composition within a range or zone of reasonableness.

Additionally, I would note, as the court did in *Ragin,* that unlike a job situation where imposition of a quota might lead to depriving some people of a job so that a quota could be met, there is absolutely no loss in the model situation. *See Ragin,* 923 F.2d at 1000–01. Even if a quota were imposed, and even if it were at a point higher than that which would be representative, no one would be deprived of housing.

**12.** There is one final note. I have no interest in subjecting newspapers to numerous claims for damages for unspecified emotional distress at seeing exclusively white models in advertisements. This concern—not noted by the majority but noted by the Second Circuit in *Ragin,* 923 F.2d at 1004–05—can easily be addressed by district courts. Cases of this nature warrant declaratory and injunctive relief. Where a violation of the Fair Housing Act is based only upon the use of white models, individual emotional distress damages would, in the ordinary case, be too speculative as a matter of law.

**13.** Current nationwide comparative statistics are not available, but recent studies support the lack of progress and in fact regression in combatting

housing discrimination. In Washington, D.C., a 1990 study found the highest rate of discrimination in five years. Vane, *Anti-black Bias in Rental Housing Prevalent in Test,* Washington Times, Jan. 31, 1991, at B3. In Boston, on the occasion of embarking on a new study, housing officials asserted that Boston had not made much progress since the early 1980s, when a study indicated blacks had nearly a ninety percent chance of encountering discrimination at least once out of four visits to rental offices. Kennedy, *Lawyers' Unit Unveils Plan to Attack Bias in Real Estate,* Boston Globe, Jan. 24, 1990, at 17. A study reported in the *Washington Post* in 1989 examining 1980 census figures found that blacks in ten major cities (Baltimore, Chicago, Cleveland, Detroit, Gary, Los Angeles, Milwaukee, Newark, St. Louis, and Philadelphia) had become "hypersegregated" as a result of housing discrimination and prejudice. Hypersegregation is the high concentration of a group in which members of the group live only near other members of the group. Rich, *Blacks in Baltimore, 9 Other Cities 'Hypersegregated,'* Washington Post, Aug. 5, 1989, at A3. A 1977 study by HUD found the rate of discrimination with respect to housing availability in the rental market to be 27% and the rate of discrimination with respect to housing availability in the sales market to be 15%. OFFICE OF POLICY DEVELOPMENT AND RESEARCH, U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, MEASURING RACIAL DISCRIMINATION IN AMERICAN MARKETS, ES–27 to –28 (1979).