

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-1998

# Fair Housing Cncl v. Montgomery Newspaper

Precedential or Non-Precedential:

Docket 97-1051

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Fair Housing Cncl v. Montgomery Newspaper" (1998). *1998 Decisions.* Paper 60.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/60

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 31, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1051

THE FAIR HOUSING COUNCIL OF SUBURBAN
PHILADELPHIA,
        APPELLANT

v.

MONTGOMERY NEWSPAPERS; MONTGOMERY
PUBLISHING CO.; ARTHUR W. HOWE, IV;
NAOMI BROWNSTEIN

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 96-cv-01381)

Argued
September 9, 1997

Before: MANSMANN and NYGAARD, Circuit Judges
and BLOCH, District Judge*

(Filed March 31, 1998)

Clifford A. Boardman, Esquire
 (ARGUED)
Two Penn Center, Suite 1920
Philadelphia, PA 19102

 Counsel for Appellant

_____

* Honorable Alan N. Bloch of the United States District Court for the
Western District of Pennsylvania, sitting by designation.

Reuben A. Guttman, Esquire
 (ARGUED)
Brian P. McCafferty
Provost & Umphrey
1350 New York Avenue, N.W.
Suite 1040
Washington, DC 20005

 Counsel for Appellees

William G. Scarborough, Esquire
Stradley, Ronon, Stevens & Young,
LLP
2600 One Commerce Square
Philadelphia, PA 19103

Karen L. Black, Esquire
Public Interest Law Center of
Philadelphia
125 South Ninth Street
Suite 700
Philadelphia, PA 19107

Counsel for Amicus Curiae Fair
Housing Action, Fair Housing
Council of Montgomery County,
Fair Housing Council of Southern
New Jersey, Fair Housing
Partnership Of Greater
Pittsburgh, Housing Consortium
for Disabled Individuals, and
Housing Council of York

John A. Feichtel, Esquire
Pennsylvania Newspaper
Publisher Association
2717 North Front Street
Harrisburg, PA 17110

Counsel for Amicus Curiae
Pennsylvania Newspaper
Publishers' Association

2

OPINION OF THE COURT

MANSMANN, Circuit Judge.

The Fair Housing Council of Suburban Philadelphia
("FHC") appeals an order of the district court granting
summary judgment in favor of Montgomery Newspapers
("Montgomery"), the papers' publisher, and their classified
advertisements editor in an action filed pursuant to the
Fair Housing Act, 42 U.S.C. SS 3604 and 3617, and the
Pennsylvania Human Relations Act, 43 P.S. S 955. The
district court's grant of summary judgment was based on
its conclusion that the FHC lacked standing under Article
III of the United States Constitution to maintain this suit.
Because we are convinced by the unique set of facts
surrounding the section 3604(c) claims that the FHC has
failed to satisfy the "injury in fact" requirement embodied in
Article III, we find that the grant of summary judgment as
to those claims was appropriate. As to the section 3617
retaliation claims, however, we find that the FHC has raised
issues of fact sufficient to withstand Montgomery's motion
for summary judgment. We will, therefore, reverse the
district court's entry of summary judgment as to the
retaliation claim and remand for further consideration.

I.

The FHC, a fair housing group which has operated in the
Philadelphia area for more than forty years, defines itself as
a non-profit organization whose "purpose is to educate and
promote fair housing and to oppose segregation based on
the protected classes found in the Fair Housing Act of
1968, as amended." On April 6, 1994, the FHCfiled a
complaint with the Pennsylvania Human Relations
Commission ("PHRC") and HUD alleging that from
November 24, 1993 forward, Montgomery "accepted and
published advertisements that were discriminatory based
on gender and familial status" in violation of state and
federal law. The complaint included copies of six
advertisements which appeared in Montgomery newspapers
between November, 1993 and March, 1994. Each of these

advertisements contained one of the following allegedly objectionable phrases: "mature person"; "ideal for quiet and reserved single and-or couple"; "professional male . . . only"; and "quiet mature setting." On January 5, 1996, the PHRC notified the FHC that "investigation of the complaint [had] resulted in a Finding of Probable Cause. . . ."

According to the FHC, Montgomery "continued publishing discriminatory speech." Therefore on February 21, 1996, the FHC filed suit in district court. An amended complaint was filed on April 10, 1996. In the amended complaint, the FHC alleged that Montgomery's acceptance and publication of discriminatory housing advertisements frustrated the organization's mission and resulted in damage to the organization caused by the need to divert resources to fight the discrimination. The FHC also alleged that as a result of the discriminatory advertisements, "families with children were barred from housing" in violation of state and federal law.

The amended complaint added allegations that Montgomery had intimidated, coerced, interfered with and retaliated against the FHC as a result of the FHC's complaint against Montgomery. The FHC contended that in newspaper articles, testimony before the state legislature, and other false statements made by or on behalf of Montgomery, the FHC had been placed in a position of ridicule which impaired the organization's effectiveness.

On September 25, 1996, Montgomery filed a motion for summary judgment which was granted on January 6, 1997. The district court held that the FHC lacked standing to pursue any of the claims alleged.

In arriving at this conclusion the district court separated the FHC's damage claims into three categories: (1) frustration of the FHC mission; (2) diversion of resources to measures designed to correct the harm caused by the discriminatory advertising; and (3) diversion of resources to litigation.

Analyzing the first category of claims, the court found that frustration of an organization's mission can never, as a matter of law, suffice to satisfy the Article III requirement of injury in fact. With respect to the alleged diversion of

resources to programs designed to counteract the discrimination, the district court found that the FHC "failed to set forth specific evidence demonstrating that its various programs have been `perceptibly impaired as a result of the diversion of its resources . . . to activities counteracting [the] allegedly discriminatory acts.' [P]laintiff has failed . . . to initiate any such educational program or to expend any funds at all on the development of such a program." Fair Housing Council v. Montgomery Newspapers, 1997 WL 5185 *7 (E.D. Pa. Jan. 7, 1997).

The court also rejected the FHC's argument that it had suffered injury for purposes of Article III when it was forced to divert resources from other programs to the pursuit of litigation. "[S]uch an injury cannot constitute, as a matter of law, an injury in fact." Id. at *6. The court reasoned that finding this type of injury sufficient would mean that an organization would be able to "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." Id. at *5 (quoting Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990)).

This timely appeal followed.

II.

In order to place the district court's holding and our review of that holding in context, we turn first to the law governing standing in general. Constitutional standing requirements have been articulated often. The Supreme Court summarized the history and parameters of those requirements most recently in Raines v. Byrd, ___ U.S. ___, 117 S. Ct. 2312 (1997). Article III S 2 of the Constitution confers jurisdiction in the federal courts over "cases" and "controversies." "One element of the case or controversy requirement is that [the plaintiffs], based on their complaint, must establish that they have standing to sue. The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit." Id. at 2317 (citation omitted).

The standing inquiry in most cases is two-tiered, involving "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."

5

Warth v. Seldin, 422 U.S. 490, 498 (1975). First, a plaintiff must satisfy the "case" or "controversy" requirement of Article III. This requirement has been described as "immutable", Bennett v. Spear, ___ U.S. ___, 117 S. Ct. 1154, 1163 (1997) and as the "irreducible constitutional minimum." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The standing requirements embodied in the "case" or "controversy" provision of Article III mean that in every case, the plaintiff must be able to demonstrate:

> An "injury in fact" -- an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; second, there be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly trace[able] to the challenged action of the defendant, and not .. . the result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Id. at 560-61. Each of these elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Bennett v. Spear, at 1163-64 (quoting Lujan, 504 U.S. at 561).

Even where this constitutional minimum has been met, courts have developed other standing principles which may be invoked to defeat a plaintiff's standing to pursue a claim.

> In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the issue of standing." Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction" are "founded in concern about the proper -- and properly limited -- role of the courts in a democratic society" but unlike their constitutional counterparts, they can be modified or abrogated by Congress.

6

Id. at 1161 (citations omitted). These second-tier prudential
limits on standing deal with who is authorized to invoke the
courts' decisional and remedial powers. The Supreme Court
in Warth v. Seldin, 422 U.S. 490, 499-500 (1975),
summarized these prudential limits as follows:

> Apart from [the] minimum constitutional mandate, this
> court has recognized other limits . . . . First, the Court
> has held that when the asserted harm is a "generalized
> grievance" shared in substantially equal measure by all
> or a large class of citizens, that harm alone does not
> warrant exercise of jurisdiction. Second, even when the
> plaintiff has alleged injury sufficient to meet the "case
> or controversy" requirements, this Court has held that
> the plaintiff generally must assert his own legal rights
> and interests, and cannot rest his claim to relief on the
> legal rights or interests of other parties. Without such
> limitations
> . . . the courts would be called upon to decide abstract
> questions of wide public significance even though other
> governmental institutions may be more competent . . .
> and judicial intervention may be unnecessary to
> protect individual rights.

(Citations omitted.)

Congress may grant an express right of action to those
who would otherwise lack standing due to application of
the prudential requirements. So long as the Article III
minimum requirements are met, a plaintiff may, where
Congress directs, have standing to "seek relief on the basis
of the legal rights and interests of others, and . . . may
invoke the general public interest. . . ." Id. at 500.
Prudential standing requirements have been eliminated in
cases arising under the Fair Housing Act ("the Act").1 The

---

1. 642 U.S.C. S 3604(c) of the Fair Housing Act makes it unlawful:

> To make, print, or publish, or cause to be made, printed, or
> published any notice, statement, or advertisement with respect to
> the sale or rental of a dwelling that indicates any preference,
> limitation, or discrimination based on race, color, religion, sex,
> handicap, familial status, or national origin or an intention to
make
> any such preference, limitation, or discrimination.

Supreme Court has established that Congress intended that standing under the Fair Housing Act be limited only by Article III and that the courts, as a result, may not create prudential barriers to standing under the Act. "[T]he sole requirement for standing to sue [under the Fair Housing Act] is the Art. III minima [sic] of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered `a distinct and palpable injury.' " Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (citations omitted).

III.

In this matter we must decide whether the FHC has shown "distinct and palpable injury" sufficient to satisfy Article III standing requirements under the Fair Housing Act. The parameters of the injury requirement were addressed by the Supreme Court in Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). In Havens, a realty company and one of its employees were alleged to have engaged in racial "steering" in violation of the Fair Housing Act. The plaintiffs included a housing organization, Housing Opportunities Made Equal ("HOME"), which had a mission generally similar to that of the FHC here. HOME alleged that it had suffered injury as a result of the "steering," claiming that its counseling and referral services had been frustrated with a consequent drain on its resources. The complaint also contained allegations that individual plaintiffs had been "deprived . . . of the . . . benefits of

_____

The Act provides that "an aggrieved person may commence a civil action in an appropriate United States district court. . . .", S 3613(a)(1)(A), and defines an "aggrieved person" (including corporations and associations) as:

> any person who--
> (1) claims to have been injured by a discriminatory housing practice;
> or
> (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

Section 3602(I).

8

interracial associations that arise from living in integrated communities free from discriminatory housing practices." Id. at 369. The Supreme Court held that HOME was entitled to sue in its own right.

After explaining that standing under the Fair Housing Act is constrained only by Article III requirements and outlining those requirements, the Court wrote:

> In determining whether HOME has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual: Has the plaintiff " `alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction?" . . . If, as broadly alleged, petitioner's . . . practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities -- with the consequent drain on the organization's resources-- constitutes far more than simply a setback to the organization's abstract social interests.

Id. 455 U.S. at 378-79 (citations omitted) (emphasis added).

Before we analyze the FHC's particular allegations of harm, we note that there is a critical distinction between Havens and this case. In Havens, the plaintiff 's damage allegations were examined in the context of a motion to dismiss. Here, however, the issue of standing was before the district court on a motion for summary judgment. While there is no dispute that the FHC's damage allegations[2]

---

2. In its amended complaint the FHC made the following allegations bearing on injury:

> 10. [E]ach act of discrimination conducted in the Delaware Valley causes a setback to the good work accomplished by the FHC's educational outreach efforts and to the development of an integrated housing community. As a result, the FHC must launch further efforts to undo the damage that the discrimination has caused . . . .
> The further efforts required are a substantial drain on its resources and harms [sic] the FHC.

9

track the language in Havens and were sufficient to withstand a motion to dismiss, something more than these naked allegations was required at the summary judgment stage. "Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561.

In order to defeat the summary judgment motion based on the issue of standing, the FHC was required to submit "affidavits or other evidence showing through specific facts . . . that . . . it [was] `directly' affected [by the alleged discrimination]." Id. at 562 (emphasis added). According to the district court, the FHC failed to carry its burden at summary judgment, producing nothing of substance to support the mere allegations set forth in the complaint. As to the discrimination claims, we agree.

IV.

Because both the FHC and the district court considered by category the damage claims based on alleged discrimination, we do the same, turning first to the allegations regarding frustration of mission. In an effort to establish standing, the FHC argued that the discriminatory advertisements "cause[d] a setback to the good work accomplished by the FHC's educational outreach efforts and to the development of an integrated housing community." The district court rejected this alleged "frustration of mission" as a basis for organizational standing, stating that "such an injury cannot constitute, as

_____

20. As a result of the conduct of the Defendants, persons were injured in their person and property. Specifically, families with children were barred from housing in violation of the . . . Act of 1968 . . . . Further, the FHC is now forced to divert funds to counteract the discriminatory message and acts of Defendants and has had its purpose frustrated by Defendants' discriminatory conduct.

10

a matter of law, an `injury in fact.' " Fair Housing Council, 1997 WL 5185 at *4. This is not an accurate statement of the law. Havens made clear that where discriminatory "practices have perceptibly impaired [an organization's ability to carry out its mission], there can be no question that the organization has suffered injury in fact." 455 U.S. at 379. Nonetheless, we are convinced that the allegations of frustration of mission were insufficient to defeat summary judgment as the FHC failed to substantiate any perceptible impairment to its mission.

The FHC contends that its mission suffered the impairment required to establish standing when it was forced to divert resources from counseling and other activities to: (1) an educational campaign designed to counteract the discriminatory effect of the advertisements; (2) an investigation designed to determine the existence and extent of on-going discrimination in advertising; and (3) litigation. We address the FHC's alleged diversion of resources in each of these categories seriatim.

A.

We turn first to the FHC's claim that it was damaged by the need to divert funds "over the course of three years to repair damage caused by" the discriminatory advertisements. Although pressed to do so in discovery and in oral argument before us, the FHC was unable to establish any connection between the allegedly discriminatory advertisements underlying this suit and the need for or implementation of a remedial educational campaign. The FHC was unable to verify that any member of the public had been denied housing or was deterred from seeking housing based on the advertisements. The FHC was also unable to establish that any member of the public complained about the contents of the advertisements or formed a misimpression about the legality of their contents. In fact, the FHC was unable to show that anyone other than the FHC staff even read the relevant advertisements.3
_____

3. We do not, as the dissent argues, impose a bona-fide home-seeker requirement. We adhere instead to the letter of the caselaw which clearly

11

Not only did the FHC fail to introduce evidence of the need for an educational program, it failed to show that any educational effort was ever implemented.

The only evidence relating to implementation of an educational effort was the FHC's allegation that, at some future time, it would be required to spend almost $100,000 in newspaper advertising and over $300,000 in seminars and mailings to reach consumers to counter the advertisements' discriminatory message. Although the questionable advertisements were published in 1993 and 1994, the FHC admitted that it has yet to undertake any educational countermeasures or to offer counseling directed at reversing the damage alleged to have been caused by the advertisements. The FHC was unable to say when such measures might be undertaken or when funds might actually be expended in support of this educational effort. These inchoate plans for future programs are insufficient to demonstrate injury for purposes of Article III:

> Such "some day" intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support afinding of the "actual or imminent" injury that our cases require.

Lujan v. Defenders of Wildlife, 504 U.S. at 564.4 The FHC's

_____

establishes that an alleged injury must be shown to flow from the conduct alleged. Where, as here, the record fails to show that any housing provider, real estate professional, or member of the public ever saw the advertisements specified, the essential causal nexus between the advertisements and the injury alleged is missing. Contrary to what the dissent suggests, the injury alleged must result from the particular discriminatory acts, not from the general conduct of multiple parties over the course of years.

4. While the dissent argues that "the cases are legion supporting a conclusion that the FHC is not required to actually pay for the advertising campaign before it can assert standing," the cases cited differ fundamentally from this one in that they address circumstances where an injury is threatened. These cases hold that where the threat of injury is real, a plaintiff will not be denied standing. Here, however, injury is alleged to have already occurred. The FHC argues that it suffered injury

12

failure to document the need for corrective education engendered by the advertisements cited, coupled with the fact that it has yet to devote any of its resources to pursuit of an educational campaign, undermines its claim to have suffered actual injury. The record is devoid of evidence that the FHC was required to modify any of its services in response to the objectionable advertisements.

B.

The FHC's claim that it suffered palpable injury when it was forced to divert resources to investigation also fails for lack of proof. The "investigation" to which the FHC refers consisted of having its staff members review classified advertisements placed in Montgomery and other suburban Philadelphia newspapers on an ongoing basis for evidence of discrimination. This investigation is alleged to have necessitated a diversion of staff resources which could have been directed to counseling and other organizational functions. The record fails, however, to establish any

_____

when it diverted resources to an education campaign. Yet, in the more than three years following publication of the relevant advertisements, the FHC has failed to implement the campaign.

The dissent's reliance on Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 261 (1997), to support standing based on plans alone is also misplaced. In Arlington Heights, a housing organization generated blueprints and building plans in preparation for the construction of low-income housing. These plans were thwarted by the defendant's denial of a zoning request. The Supreme Court held that where "the challenged action [stood] as an absolute barrier to constructing the housing that [the plaintiff] contracted to place on the site" and the planned project was "detailed and specific," the "court [was] not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." Id. At 261-62. In Arlington Heights, the defendant's thwarting of plans constituted the injury; the plans could not be effected due to the defendant's conduct. In this case, by contrast, the record does not show that the need for an educational effort resulted from or was connected in any clear way to the six allegedly discriminatory advertisements. Moreover, the advertisements at issue did not impede the FHC's ability to implement its educational plan.

13

connection between this investigation and the 538<!>advertisements which form the basis for this suit.

Depositions of members of the FHC staff established that the purchase of newspapers and review of the classified sections which comprised the "investigation" went on as part of the FHC's normal day-to-day operations. This "investigation" was not motivated by the advertisements at issue in this suit or by a complaint about advertising. It was not limited to Montgomery newspapers, and did not increase or go on longer than it otherwise might have as a result of the allegedly discriminatory advertising alleged here.5

The record before us does not establish that the FHC altered its operations in any way as a result of the allegedly discriminatory advertisements or diverted any of its resources to a bona fide investigation. At the summary judgment stage, bare allegations of injury such as those based on the "investigation" described are not enough to establish standing. This is true even where, as here, an organization holds the status of a private attorney general charged with enforcing the provisions of the Fair Housing Act. A private attorney general is subject to the following rule:

> [A]s long as [the private attorney general] suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were

_____

5. The "investigation" undertaken here differs dramatically from that described in Havens. There, the investigation and the allegedly discriminatory acts were closely linked. Moreover, it was clear that the organization in Havens did something different as a result of the particular conduct which was alleged to be illegal. The case before us is fundamentally different. The record does not support the conclusion that the FHC in conducting its investigation, responded to the advertisements at issue or that it would not have undertaken the same investigative efforts in the absence of these advertisements. Although the dissent's argument that the "investigation" here was sufficient to impart standing is appealing, it is simply not supported by the record or by the caselaw. We cannot conclude, and the dissent does not point to anything in the record which would allow us to conclude that the"investigation" was connected in any concrete way to the specific acts of discrimination alleged in this suit.

14

> infringed. The central issue at this stage of the
> proceedings is not who possesses the legal rights . . .
> but whether [the plaintiffs] were genuinely injured by
> conduct that violates someone's . . . rights, and thus
> are entitled to seek redress of that harm. . . .

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 103
n.9 (1979) (emphasis added).

As the district court found, there is no credible evidence
of injury to the FHC other than the dedication of funds and
other resources to pursuit of this litigation. The FHC
contends that the diversion of resources to litigation is
alone sufficient to confer standing under Article III. We
disagree.

C.

In deciding organizational standing questions after
Havens, appellate courts have generally agreed that where
an organization alleges or is able to show – depending on
the stage of the proceeding – that it has devoted additional
resources to some area of its effort in order to counteract
discrimination, the organization has met the Article III
standing requirement. A number of our sister courts have,
however, adopted different views of whether the injury
necessary to establish standing flows automatically from
the expenses associated with litigation.6  We align ourselves

_____

6. See Fair Employment Council of Greater Washington, Inc. v. BMC
Marketing Corp., 28 F.3d 1268 (D.C. Cir. 1994) (Havens did not base
standing on diversion of resources but on injury caused to organization's
programs); Spann v. Colonial Village, Inc., 899 F.2d 24 (D.C. Cir. 1990)
(fair housing organization cannot manufacture the injury necessary to
maintain a suit from its expenditure of resources on that very suit);
Ragin v. Macklowe, 6 F.3d 898 (2d Cir. 1993) (housing organization had
standing to sue based on diversion of resources to pursue litigation and
other legal efforts to counteract the discrimination); Hooker v. Weathers,
990 F.2d 913 (6th Cir. 1993) (fair housing organization had standing
based on investigation using testers and confirmation of facts and
circumstances alleged in complaint); Housing Opportunities Made Equal,
Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644 (6th Cir. 1991) (injury
may
be found where group must devote additional resources to investigating
and negating impact of discriminatory advertising independent of suit
challenging the advertisements); Village of Bellwood v. Dwivedi, 895 F.2d
1521 (7th Cir. 1990) (to have standing fair housing organization need
only show deflection of time and money from counseling to legal efforts).

with those courts holding that litigation expenses alone do not constitute damage sufficient to support standing.

We are persuaded to take this position by the analysis set forth by the Court of Appeals for the D.C. Circuit in Spann v. Colonial Village, Inc., 899 F.2d 24 (D.C. Cir. 1990). In Spann, the court of appeals read Havens narrowly, holding that in order to establish standing, an organization must point to a "concrete and demonstrable injury to [its] activities." Id. at 27. The court explained that merely devoting funds to support a lawsuit will not suffice to establish an injury within the scope of Article III:

> An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.

Id. The Court in Spann summarized the holding in Havens as follows:

> Havens makes clear . . . that an organization establishes Article III injury if it alleges that purportedly illegal action increased the resources the group must devote to programs independent of the suit challenging the action.

Id. (Emphasis added.)

Under this standard, something more than litigation is required to establish injury. In Spann, it was the organization's "expenditures to reach out to potential home buyers or renters who are steered away from housing opportunities by discriminatory advertising or to monitor and to counteract on an ongoing basis public impressions created by defendants' use of print media" -- expenditures of a type not made in this case -- which satisfied the injury requirement of Article III. Id. at 29.

The Court of Appeals for the D.C. Circuit reaffirmed its commitment to a narrow reading of Havens in Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1277 (D.C. Cir. 1994):

16

> [Havens] did not base standing on the diversion of
> resources from one program to another, but rather on
> the alleged injury that the defendants' actions
> themselves had inflicted upon the organization's
> programs. To be sure, the Court did mention the "drain
> on the organization's resources." Yet this drain
> apparently sprang from the organization's need to
> "counteract" the defendants' assertedly illegal
> practices, and thus was simply another manifestation
> of the injury that those practices had inflicted upon
> "the organization's non-economic interest in
> encouraging open housing" . . . .

The FHC urges us to reject the analysis set forth in
Spann and BMC Marketing and to embrace instead the
result reached by the Court of Appeals for the Seventh
Circuit in City of Bellwood v. Dwivedi, 895 F.2d 1521 (7th
Cir. 1990). In Bellwood, a real estate brokerage firm and
two of its employees were sued for discriminatory practices
alleged to violate the Act. On appeal of a jury verdict in
favor of the plaintiffs, the court considered whether a
nonprofit corporation promoting integrated housing lacked
Article III standing. Relying on the decision in Havens the
court found that the organization did have standing:

> Havens makes clear . . . that the only injury which
> must be shown to confer standing on a fair housing
> agency is deflection of the agency's time and money
> from counseling to legal efforts directed against
> discrimination. These are opportunity costs of
> discrimination since although the counseling is not
> impaired directly there would be more of it were it not
> for the defendant's discrimination.

Id. at 1526 (emphasis added).

The district court in this matter declined to follow
Bellwood.7 We are convinced that the district court's

_____

7. We are convinced that the FHC overstates the breadth of the holding
in Bellwood. The holding in Bellwood was not that litigation alone
constituted injury sufficient to convey standing. In Bellwood, the village
undertook a bona fide investigation of a number of real estate agencies
in order to determine whether these agencies were engaged in racial

reliance on the position taken in Spann and BMC Marketing represents the better-reasoned approach. We hold, therefore, that the pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III.

In reaching this conclusion, we emphasize that we

> have no doubt about the sincerity of [the FHC's] stated objectives and the depth of their commitment to them. But the essence of standing "is not a question of motivation but of possession of the requisite interest that is, or is threatened to be, injured by the unconstitutional conduct."

Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 225-26 (1973) (quoting Doremus v. Board of Education, 342 U.S. 429, 435 (1952)).

We emphasize, too, that this holding does not compromise our commitment to the laudable goal advanced by the FHC; eliminating discrimination in housing is vitally important. We cannot agree, however, that this goal should be attained by an approach which shrinks the Article III standing requirement to a point where the requisite injury flows automatically from the burdens associated with filing a lawsuit. Resort to this extreme position simply is not necessary. The hurdle raised by the injury element of established standing principles is not a high one. Fair housing organizations have regularly and successfully shown injury in litigating suits designed to eradicate

_____

steering. The fair housing organization was hired to carry out the testing by sending both black and white "clients" to the real estate agencies. When the tests revealed that steering was taking place, the village, the fair housing organization and the testers filed suit. In holding that the organization had standing to sue, the Court of Appeals for the Seventh Circuit held that the organization's "legal efforts" to investigate steering were sufficient to confer standing. Litigation plus some other legal effort -- there, investigation -- provided the basis for standing. Because the FHC did not devote time and resources to legal efforts short of litigation, to adopt the dissent's argument and find that the injury requirement has been met in this case would require that we go beyond the result reached in Bellwood.

18

discrimination illegal under the Fair Housing Act. Our
decision should not restrict or impede in any meaningful
way the ability of these organizations to combat violations
of the Act. Where discrimination does, in fact, occur, it
should not be insurmountably difficult for these
organizations to establish standing either in their own right
or on behalf of their members by referring to well-
established standing principles and adjusting their
pleadings and proof accordingly.

V.

We turn next to the FHC's retaliation claim. In Count II
of the amended complaint, the FHC alleges that
Montgomery violated section 3617 of the Act8 by knowingly
and maliciously creating, publishing in its newspapers, and
mailing to the legislators of the Commonwealth of
Pennsylvania, false statements about the FHC, its actions
and its motivations. The district court granted
Montgomery's motion for summary judgment on this claim,
again on the basis of standing:

> [The FHC] has not set forth any evidence indicating
> that it has suffered . . . an "injury in fact" from
> defendant's newspaper publications or statements to
> legislators. The deposition testimony offered by [the
> FHC] reveals instead that [it] has not lost any revenue,
> income, government contracts, or members as a result
> of the publications and statements at issue . . . As[the
> FHC] has not established that it has suffered an "injury
> in fact" from said publications and statements, this
> Court concludes that the FHC does not have standing
> to bring this claim.

Fair Housing Council v. Montgomery Newspapers, 1997 WL
5185 at * 9-10.

_____

8. This section provides that:

> It shall be unlawful to coerce, intimidate, threaten or interfere
> with any person in the exercise or enjoyment of, or on account of
his
> having exercised or enjoyed, or on account of his having aided or
> encouraged any other person in the exercise or enjoyment of, any
> right granted or protected by [other sections] of this title.

19

We have examined the district court's conclusion in light of the record and are convinced that the evidence adduced by the FHC with respect to the retaliation claim was sufficient to withstand Montgomery's motion for summary judgment.

In support of its argument that the district court erred in granting summary judgment on this claim, the FHC directs our attention to the following excerpt from the affidavit of James Berry, Executive Director of the FHC:

> 7. Some of the falsehoods of defendants were communicated to one of the FHC's primary federal grant funders, and to fair housing advocates around the country. As a result, at least in part, of these falsehoods, [the FHC] was investigated by that primary federal grant funder, and has been questioned by fair housing advocates concerning the FHC's practices as to following the law. [The FHC's] reputation in the fair housing and grant provider communities has been damaged.

> 8. [The FHC has] learned . . . that HUD, who received defendants' falsehoods, will not renew one of its grants to [the FHC]. The grant was worth hundreds of thousands of dollars.

The FHC cites, too, Berry's testimony in deposition that he was contacted by a representative of the Fair Housing Initiatives Program (FHIP), a government entity, seeking to arrange a conference call between Berry and the FHIP director in order to discuss the substance of lawsuits filed by the FHC. Berry was informed that:

> Somebody in the Department of Housing and Urban Development had read an article that went out over the Associated Press containing the lies that Mr. Howe had testified to in front of the Pennsylvania state legislature.

The FHIP representative informed Berry that FHIP personnel had "read about [the FHC] and are very concerned, they've had inquiries from Congress as well as the White House." Berry testified that he was then required to discuss the terms and phrases underlying FHC lawsuits with FHIP representatives.

Without considering any other part of the record cited by the FHC, we are convinced that there was sufficient evidence before the district court at summary judgment to establish a triable issue of fact with respect to the retaliation claim. Berry's uncontroverted testimony indicates, at a minimum, that Montgomery's statements in the press forced the FHC to answer questions posed by FHIP and to defend the basis for FHC litigation. Through this testimony, the FHC has offered proof that it sustained at least non-economic harm which was "concrete" and "particularized" and "actual" or "imminent." See Lujan, 504 U.S. at 560-61. Accordingly, the district court erred in granting summary judgment in favor of Montgomery on the retaliation claim.

VI.

Because we conclude that the FHC succeeded in establishing an "injury in fact" sufficient to withstand Montgomery's motion for summary judgment on the section 3617 claims, we will reverse that portion of the order of the district court granting summary judgment to Montgomery on these claims. In all other respects, we will affirm the order of the district court.

NYGAARD, Circuit Judge, concurring and dissenting.

I agree that the Fair Housing Council has standing to assert a claim of retaliation against Montgomery Newspapers under 42 U.S.C. S 3617. However, I would go further and also conclude that the FHC has standing to assert a claim of illegal advertising under 42 U.S.C. S 3604(c), and that the FHC is injured because it must divert resources to a large-scale educational campaign to inform landlords, real estate agents, consumers and the defendant newspaper itself that discrimination based on familial status violates the Fair Housing Act. The FHC has proffered evidence that education is necessary because housing providers were continuing to write advertisements that violated 42 U.S.C. S 3604(c), and the defendant itself, Montgomery Newspapers, was continuing to publish the illegal advertisements and promote misunderstanding of the familial status provisions of the Act.

The majority's view of standing is too narrow, and I am convinced that its opinion will do violence to the law of standing in this circuit. The majority suggests that to be injured, the FHC must have either implemented the educational campaign or submitted a more detailed plan to the district court. In the alternative, the majority states that the FHC could have produced a home seeker who was denied housing, deterred from seeking housing, or formed a misimpression about housing availability as a result of the advertisements published in the Montgomery Newspapers. The majority opines that the FHC did not demonstrate the need for the educational program and also failed to show that the plan was implemented. I disagree. The FHC has submitted a detailed plan for its educational campaign, within which it describes exactly why the campaign is a necessary response to the advertisements. This plan is sufficiently concrete to confer standing. Furthermore, the FHC does not have to produce an aggrieved home seeker because it has clearly demonstrated the need for an educational campaign to counter the advertisements that were placed by housing providers in flagrant disregard of 42 U.S.C. S 3604(c).

The majority also concludes that investigation and litigation costs alone cannot confer standing. Because I find

22

standing for educational costs, it would ordinarily not be necessary for me to reach this issue. However, I write separately on this issue as well, because I think that costs incurred applying legal pressure to a newspaper publishing illegal advertisements can confer standing.

I. Article III Standing Requirements

A plaintiff organization has standing if it meets the immutable requirements of Article III, Section 2 of the Constitution. First, the plaintiff must have suffered an injury in fact, an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). Second, there must be a causal connection between the injury and the challenged action of the defendant. The injury has to be fairly traceable to the defendant's actions, and not the result of the independent action of a party not before the court. Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41–42, 96 S. Ct. 1917, 1926 (1976). Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan, 504 U.S. at 561, 112 S. Ct. at 2136; Simon, 426 U.S. at 38, 43, 96 S. Ct. at 1924, 1926.[1] When the Supreme Court considered a fair housing organization's standing to sue under the Fair Housing Act, it concluded that Congress intended to abrogate any additional prudential standing requirements and allow standing based only upon the constitutional requirements of Article III. Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S. Ct. 1114, 1121 (1982) (citing Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 103 n.9, 109, 99 S. Ct. 1601, 1609 n. 9, 1612 (1979)).

Havens held that the plaintiff organization had standing to sue because the activity that allegedly violated the Fair Housing Act perceptibly impaired its counseling and referral services. This impairment met the "injury in fact"

---

1. The district court only addressed the first element of standing, holding that the FHC did not show Article III injury. Accordingly, I do not address the final two elements of causation and redressability, although I will point out that those two elements are clearly present here.

23

test because a concrete and demonstrable drain on resources is a more plausible injury than a conjectural "setback" to an organization's abstract social interests. Id. at 379 (distinguishing Sierra Club v. Morton, 405 U.S. 727, 92 S. Ct. 1361 (1972)). Following Havens, the Courts of Appeals have agreed that a fair housing organization will have standing to challenge a newspaper's advertising practices under 42 U.S.C. S 3604(c) if it can demonstrate that the newspaper's discriminatory advertising caused the organization to divert resources to identify and negate the impact of those advertisements. See, e.g., Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77 (D.C. Cir. 1994); Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644 (6th Cir. 1991); Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990). The FHC has clearly met this burden.

The Circuits are split, though, as to whether the diversion of resources solely for litigation and investigation activities can confer standing. Compare Spann, 899 F.2d at 27 (D.C. Cir. 1990) (litigation costs cannot confer standing), with Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993) (finding standing based on staff time spent exclusively on litigation), and Hooker v. Weathers, 990 F.2d 913, 915 (6th Cir. 1993) (investigation to confirm facts in complaint insufficient to confer standing), and City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc., 982 F.2d 1086, 1095 (7th Cir. 1992) (legal efforts directed against discrimination are sufficient to impart standing). The majority holds that the litigation and investigation costs cannot confer standing. I disagree and would hold that in some situations, like this case, they can constitute an Article III injury.

II. Educational Injury

A. Sufficiency of Evidence

As explained above, the courts interpreting Havens agree that the diversion of resources to educational programs is sufficient to impart Article III standing. See, e.g., Spann, 899 F.2d at 27. A "concrete drain on time and resources is sufficient to satisfy Article III's injury in fact requirement."

24

Spann, 899 F.2d at 29. An "identifiable trifle" of this type of injury will suffice to confer standing upon the FHC.2 United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 2417 n.14 (1973) (rejecting the argument that standing should be limited to those significantly injured, and ruling that any level of injury is sufficient to confer standing). Accordingly, to demonstrate "educational injury," the FHC must only raise a genuine issue of material fact that its plan to educate the real estate industry and consumers will be a concrete and demonstrable drain on its resources, and that such education is necessary to counter the illegal housing advertisements.

The FHC has presented sufficient evidence of injury to compel my conclusion that Montgomery Newspapers is not entitled to judgment as a matter of law. James Berry, the executive director of the FHC, described the campaign by which the FHC will attempt to educate real estate professionals. Berry also stated that the FHC will have to spend almost $100,000 in newspaper advertising to counter Montgomery News' discriminatory messages. Jan Chadwick, Assistant Director of the FHC, explained that the FHC has formulated "an educational plan that would educate both the public and the industry what the proper Fair Housing laws are . . . to reverse the damages [caused by discrimination] in the whole region, specifically families with children." This explanation mirrors FHC's allegation that

> "each act of discrimination conducted in the Delaware
> Valley causes a setback to the good work accomplished
> by the FHC's educational and outreach efforts and to
> the development of an integrated housing community.
> As a result, the FHC must launch further efforts to
> undo the damage that the discrimination has caused."

_____

2. We do not confuse this with a "scintilla of evidence" which is unquestionably insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). In this case, the FHC has presented sufficient evidence to allow a reasonable jury to return a verdict in its favor on the issue of standing
to sue under the Fair Housing Act.

25

(Pl.'s Am. Comp. P 10.) The FHC also prepared a detailed plan entitled "Appellants' Statement of Proposed Education-Repair Campaign." The purpose of the plan is to reach, among others, consumers, housing providers, and real estate professionals to counteract advertisements that leave readers believing that it is legal to turn away families with children. The "Proposed Plan" explains what the FHC alleges: a large-scale educational campaign is necessary because the continued publication of illegal advertisements causes an "overwhelming misunderstanding" about the Act. The Plan is specific to the extent that it contains sample advertisements to be placed in Montgomery Newspapers, the frequency of planned publication, a proposed budget for executing the Plan, and details of educational efforts other than newspaper advertisements.

The majority states that the only evidence relating to the educational effort produced by the FHC was "an allegation that, at some future time, it would be required to spend almost $100,000 in newspaper advertising and more than $300,000 in seminars and mailings to reach consumers to counter the advertisements' discriminatory message." This statement is incorrect, based on the substantial record evidence.

B. The need for corrective action

The majority's conclusion crumbles upon examination of the entire Proposed Plan and explanations of the FHC staff, discussed above. By focusing only on the necessity to educate home seekers and consumers, the majority overlooks an entire segment of the FHC's mission: to educate publishers and housing providers. Montgomery Newspapers published discriminatory ads, which itself demonstrates that housing providers and the newspaper do not understand the terms of the Fair Housing Act. Because the FHC aims to ensure compliance by education, it must now divert resources to redress that damage. Thus, I am compelled to conclude that the FHC has suffered the requisite "identifiable trifle" of injury to its educational programs.

The FHC has demonstrated that its educational plan is a necessary response to correct the discriminatory

advertisements published by Montgomery Newspapers. The "Proposed Plan" explains that, among others, real estate professionals are ignorant of the family status provisions of the Fair Housing Act. Advertisements that contain comments such as "no children or pets," and "professional male need only apply" exemplify this ignorance. The FHC intends to reach consumers to explain the Fair Housing Act. However, the majority fails to recognize that the FHC also plans to explain Fair Housing Act compliance to housing providers and real estate professionals, who place and read advertisements in Montgomery Newspapers and perpetuate discriminatory advertising.

The majority suggests that the FHC would have satisfied standing requirements if it could show that home seekers have actually been barred from housing, deterred from seeking housing, or formed a misimpression about housing availability as a result of the advertisements published in the Montgomery Newspapers. This is simply incorrect. An aggrieved home seeker is not necessary to show a violation of section 3604. Housing providers and newspapers violate 42 U.S.C. S 3604(c) upon publication. The Fair Housing Act expressly empowers organizations like the FHC to enforce its provisions without joining a home seeker as a co-plaintiff, 42 U.S.C. SS 3602, 3613, in the federal district courts, 42 U.S.C. S 3613(a)(1)(A), to seek the award of actual or punitive damages or the grant of permanent or temporary injunctive relief. 42 U.S.C. S 3613(c)(1).

C. Imminent and Concrete Injury

The FHC has successfully adduced facts to show concrete injury that is certainly impending, as required by Lujan. 504 U.S. at 564. The majority concludes that the FHC would be injured if it already implemented the educational program. This is not correct. The cases are legion supporting a conclusion that the FHC is not required to actually pay for the advertising campaign before it can assert standing. See, e.g., Pennell v. City of San Jose, 485 U.S. 1, 8, 108 S. Ct. 849, 855 (1988) (holding that because it is not unduly speculative to conclude that the ordinance at issue will be enforced against members of the Association, this is a sufficient threat of actual injury to satisfy Article III); Babbitt v. Farm Workers, 442 U.S. 289,

27

298, 99 S. Ct. 2301, 2308 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."); Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 98 S. Ct. 2620 (1978) (Plaintiff alleged that, if constructed, the power plant's operation would cause the emission of radiation. The Court held that the plaintiff's alleged injury was sufficiently concrete to confer standing.); Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S. Ct. 658, 663 (1923) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough."); Roe v. Operation Rescue, 919 F.2d 857, 964-65 (3d Cir. 1990) (holding that clinics not actually blockaded by defendant organization had standing because the threat that defendants would blockade the clinics in the future was real and immediate); Public Interest Research Group, Inc. v. Powell Duffryn, 913 F.2d 64, 71 (3d Cir. 1990) (plaintiffs' asserted injury, that they would use the water for boating and aesthetic enjoyment if it was not polluted, was sufficient to confer standing, even though they had not used the water in its polluted state).

The FHC also satisfies Lujan by setting forth concrete plans for its educational program. The majority categorizes the FHC plan as the "some day" intentions prohibited by Lujan, 504 U.S. at 560-61, 112 S. Ct. at 2138, and suggests that the FHC has proffered no concrete plans or specifications as to when the plans will be carried out. I disagree. In Lujan, the Supreme Court suggested that had the plaintiffs actually purchased a plane ticket, their plans to observe the endangered species would not be "some-day intentions." Id. Here, the plan submitted by the FHC is more extensive and expensive than the mere plane ticket in Lujan.

Moreover, the majority's conclusion is at odds with the Supreme Court's holding in Village of Arlington Heights v. Metropolitan Housing Dev. Corp., wherein mere blueprints and building plans were sufficient to confer standing on a non-profit housing organization. 429 U.S. 252, 261, 97 S. Ct. 555, 561 (1977). The housing organization in Arlington Heights planned to build low income housing to further its

28

interest in making low cost housing available in areas where it was scarce, but its plans were thwarted when the local government denied its zoning request. The Court held that the organization's plans to build, and its related goals, were not an abstract concern and provided the essential dimension of specificity required to determine standing at trial. Id. at 263. The situation of the FHC is analogous. The FHC plans to educate the public that discrimination based on familial status is illegal. That plan is equally specific and detailed, and therefore sufficient to confer standing.

III. Investigation Injury

The FHC also adduced evidence sufficient to confer standing for a 42 U.S.C. S 3604(c) violation based on the costs to investigate the housing advertisements in the Montgomery Newspapers. alleged in the complaint constitute injury for standing purposes). Havens found "injury in fact" when a fair housing organization had to divert resources to "identify and counteract" discriminatory practices. 455 U.S. at 379, 102 S. Ct. at 1124. Like "educational injury," the courts following Havens agree that costs incurred investigating violations of the Fair Housing Act can confer standing. See, e.g., Hooker v. Weathers, 990 F.2d 913, 915 (6th Cir. 1993) (costs incurred in the investigation to confirm the facts and circumstances).

The majority erroneously concludes that the FHC investigation cannot confer standing because it was a regular part of the day-to-day operations of the organization. It cites "depositions of FHC staff" in support of this conclusion. Indeed, there was some suggestion in the deposition of Jan Chadwick that reviewing housing advertisements was a regular matter of business for FHC staffers. However, based on the evidence, one could also reasonably conclude that the FHC investigation followed violations of 42 U.S.C. S 3604(c), and because of repeated violations, became a daily function of the FHC. For standing purposes, we look only for an "identifiable trifle" of injury, so the FHC need only submit evidence to create a genuine issue of whether it diverted the slightest amount of additional time to read the Montgomery Newspapers. U.S. v. Students Challenging Regulatory Agency Procedures, 412

29

U.S. 669, 689 n.14, 93 S. Ct. 2405, 2417 n.14 (1973). I believe they have met this burden.

The FHC made a specific showing of its increased efforts to identify and eventually counteract discriminatory ads under 42 U.S.C. S 3604(c). The record shows that investigation efforts began in 1989, when the FHC began reviewing the housing advertisements in the Montgomery Newspapers. The investigation was prompted by the FHC's discovery that despite a recent amendment to the Fair Housing Act, local papers did not comply with the provisions prohibiting discrimination on the basis of family status. The FHC filed charges with the Pennsylvania Human Relations Commission and the Department of Housing and Urban Development, but the illegal advertisements continued. The graph submitted by the FHC shows that the FHC devoted more resources to identify the discriminatory advertisements in the Montgomery Newspapers than it would have normally directed toward simply reviewing housing advertisements. The FHC also proffered the affidavit of Executive Director James Berry explaining the increased investigative efforts, and this was supported by the materials charting the resources dedicated to investigating the housing advertisements in the Montgomery News.

Counsel for Montgomery Newspapers suggested during oral argument that the FHC could have sent testers to determine whether the ads were placed with the intention of discrimination on the basis of familial status. Certainly, that was one potential investigatory technique available to it. However, no one technique is required to establish standing. A violation of section 3604(c) occurs upon publication. This is distinguishable from a violation of section 3604(d), which occurs when misleading information is given to a tester. Naturally, one method of identifying violations under section 3604(c) is to read the newspaper. FHC did just that, and its efforts were intended to identify the pattern and practices of discriminatory conduct and to counteract it through legal pressure and education.

Congress intended to confer broad rights to enforce the Fair Housing Act. See Havens, 455 U.S. at 374 n.14, 102 S. Ct. at 1122 n.14. For example, a tester may pose as a

30

prospective purchaser, expect unlawful practices based on race, and have standing to sue under 42 U.S.C. S 3604(d) if the housing provider misrepresents the availability of housing. This is distinguishable from 42 U.S.C. S 3604(a), which requires a bona fide offer for housing to present a claim of a discriminatory refusal to sell or rent. However, like the tester provision, there is no "bona fide" requirement for enforcement of the advertisement provision.

Nevertheless, the majority suggests that the investigation must be motivated by a complaint about advertising in the Montgomery Newspapers. This is not correct. Independent investigations not initiated by complaints were also a part of the regular activities of the fair housing organization in Havens. In Havens, the organization's activities included:

> "conducting independent investigations of real estate brokers located in the metropolitan area to determine whether housing is being made available without regard to race; and taking appropriate steps to eliminate any racial discriminatory housing practices it may have found to exist."

Coles v. Havens Realty Corp., 633 F.2d 384, 385 (4th Cir. 1980), aff'd sub. nom. Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S. Ct. 1114 (1982). The Court of Appeals for the Fourth Circuit concluded that the drain on resources necessary to identify violations of the Fair Housing Act is sufficient to confer standing, irrespective of whether such investigation was motivated by a complaint.

IV. Litigation Injury

The FHC's "litigation injuries" in the form of attorneys' fees to bring this case are insufficient to impart standing under the Fair Housing Act, especially since the act provides for recovery of attorneys' fees. 42 U.S.C. S 3613(c)(2). My agreement with the majority stops there.

Havens did not specifically decide whether the costs of litigation or enforcement of the Fair Housing Act are sufficient to confer standing. Arguably, this activity would fall under the category of activities intended to "counteract" discrimination. Courts from the Second and Seventh

31

Circuits have read Havens to confer standing even when resources are diverted for litigation purposes only. See, e.g., City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc., 982 F.2d 1086, 1095 (7th Cir. 1992); Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1526 (7th Cir. 1990); Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993). The majority does not find these cases persuasive, instead relying on the Court of Appeals for the District of Columbia Circuit's conclusion that litigation costs alone cannot confer standing because it would allow litigants to achieve manufactured, or "purely self-referential injury" by merely filing the complaint. Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268 (D.C. Cir. 1994); Spann v. Colonial Village, Inc., 899 F.2d 24 (D.C. Cir. 1990).

In my opinion, the FHC has standing, even under the Court of Appeals for the District of Columbia Circuit's holdings, because many activities that fall between investigation and litigation can confer standing under Havens. For example, in this case, the FHC chose many non-litigation methods to apply legal pressure upon the Montgomery Newspapers to enforce the Fair Housing Act. The FHC filed a complaint with the Pennsylvania Human Resources Commission. In addition, the FHC attempted to notify the newspaper of its violations of section 3604 (c). My conclusion to confer standing upon fair housing organizations for enforcement activities, other than the filing of the lawsuit, does not conflict with the Court of Appeals for the D.C. Circuit's cases that the majority finds persuasive. BMC Marketing and Spann only prohibit conferral of standing from the act of filing the lawsuit.

My conclusion is also entirely consistent with the policies of the Fair Housing Act. First, Congress intended that groups like the FHC take action to enforce the provisions of the Fair Housing Act. If we do not recognize the efforts that precede litigation as injury, we will cramp the options now open to fair housing organizations that are laboring to counteract discrimination. Large scale, long term pre-litigation efforts that draw from program resources should constitute injury for standing purposes even if they culminate in litigation. Second, I see little danger that

32

plaintiffs may "manufacture standing" in the context of the
Fair Housing Act. It is not that easy. The greater danger is
exaggerating the risk of nullifying Article III, and thereby
eviscerating the statutory scheme of the Fair Housing Act,
which clearly relies upon private enforcement to ensure
compliance.

The FHC correctly states that the Fair Housing Act relies
upon private attorneys general to enforce its provisions. See
42 U.S.C. S 3613;3 Trafficante v. Metropolitan Life Ins. Co.,
409 U.S. 205, 210-211, 93 S. Ct. 364, 367-68 (1972)
(noting the paucity of statutory remedies); Hooker v.
Weathers, 990 F.2d 913, 915 (6th Cir. 1993) (finding
standing under Havens due to the increase of resources
devoted to programs independent of its suit challenging the
action); Housing Opportunities Made Equal v. Cincinnati
Enquirer, Inc., 943 F.2d 644, 646 (6th Cir. 1991) ("Courts
have given a broad reading to the FHA in order to fulfill its
remedial purpose."). Accordingly, we have an obligation to
address the issue of standing (pursuant to "litigation
injuries") so as to fulfill the private enforcement provisions
of the Fair Housing Act. "We can give vitality to [The Fair
Housing Act] only by a generous construction which gives
standing to sue to all . . . who are injured by . . .
discrimination . . . within the coverage of the statute."
Trafficante, 409 U.S. at 212, 93 S. Ct. at 368. We should
carefully consider which "litigation injuries" confer standing
to maintain the integrity of Article III, while still allowing
fair housing organizations to fulfill their role as private
attorneys general. Spann, 899 F.2d at 30 (citing Trafficante,

_____

3. A violation of the Fair Housing Act does not constitute per se injury
to
a fair housing organization. The FHC is mistaken, to the extent that it
reads Bennett v. Spear to confer standing without meeting Article III
requirements. ___ U.S. ___, 117 S. Ct. 1154 (1997). Bennett discusses
the "zone of interest test," a jurisprudential test for standing, which
applies above and beyond the Article III. Id. at 1160 (stating Article III
is
an irreducible constitutional minimum). The "zone of interest test" does
not apply to standing to pursue an action under the Fair Housing Act.
Trafficante v. Metropolitan Life Ins. Co., 409 US. 205, 209, 93 S. Ct.
364,
367 (1972). Despite its misinterpretation of Bennett, the Council has
struck on an important point regarding their role in ensuring compliance
with the Fair Housing Act.

33

409 U.S. at 211, 93 S.Ct. at 368). As explained above, I believe I have done so in this case: allowing the FHC's investigations and legal pressure, applied through letters or administrative proceedings to confer standing, but rejecting the theory that the FHC's costs to file this lawsuit can impart standing.

Finally, we cannot overlook the will of the legislature in determining whether the FHC has standing to sue. Havens, 455 U.S. at 373, 102 S. Ct. at 1121. The injury "required by Article III may exist solely by virtue of `statutes creating legal rights, the invasion of which creates standing.' " Id. (citing Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 2205 (1975)). "The policies of the Act and the concrete injuries alleged by the plaintiff organizations thus intertwine to support plaintiffs' standing to bring this suit." Spann, 899 F.2d at 31 (citations omitted). Congress specifically endorsed the values that the FHC seeks to enforce and their methods of enforcement, in the Fair Housing Act:

> "The Congress finds that (1) in the past half decade there have been major legislative and administrative changes in Federal fair housing and fair lending laws and substantial improvements in the Nation's understanding of discrimination in the housing markets; . . . (9) the proven efficacy of private nonprofit fair housing enforcement organizations and community-based efforts makes support for these organizations a necessary component of the fair housing enforcement system."

Fair Housing Act of 1968, Pub. L. No. 102-550, Section 905(a), 106 Stat. 3869 (1992).

In sum, we should not so fear the possibility of "manufactured standing" that we set barriers artificially high and thereby nullify the private enforcement provisions of the Fair Housing Act.

V. Conclusion

For all the foregoing reasons and upon all the foregoing grounds, I conclude that the FHC has standing to advance

34

a claim under 42 U.S.C. S3604(c). I would give the FHC its day in court.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit